# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| JOHN L. ANDERSON, Derivatively on Behalf of Nominal Defendant BLACK BOX CORPORATION, | ) ) ) | No. |
|  | ) | **SHAREHOLDER DERIVATIVE** |
| Plaintiff, | ) | **COMPLAINT** |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| JEFFREY M. BOETTICHER, FREDERICK C. YOUNG, ANNA M. BAIRD, KATHLEEN BULLIONS, FRANCIS WERTHEIMBER, MOACYR SAMPAIO, ROGER E.M. CROFT, MICHAEL MCANDREW, BRIAN D. YOUNG, WILLIAM F. ANDREWS, THOMAS G. GREIG, WILLIAM R. NEWLIN, MICHAEL E. BARKER and WILLIAM NORRED, | ) ) ) ) ) ) ) ) ) ) ) ) ) |  |
|  | ) |  |
| Defendants, | ) |  |
|  | ) |  |
| and | ) | **JURY TRIAL DEMANDED** |
|  | ) |  |
| BLACK BOX CORPORATION, | ) |  |
|  | ) |  |
| Nominal Defendant. | ) |  |
|  | ) | **ELECTRONICALLY FILED** |

Plaintiff John L. Anderson, by the undersigned attorneys, submits this Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.    This is a shareholder's derivative action brought for the benefit of nominal defendant Black Box Corporation ("Black Box" or the "Company") against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment, statutory violations and other violations of law.

1

2.      On September 6, 2006, the United States Senate Committee on Finance held a hearing, "Executive Compensation: Backdating to the Future/Oversight of current issues regarding executive compensation including backdating of stock options; and tax treatment of executive compensation, retirement and benefits."

3.      At the Senate Finance Committee Hearing, the Senate Finance Committee Chairman, Senator Chuck Grassley, in his opening statement, stated: "[Options backdating] is behavior that, to put it bluntly, is disgusting and repulsive.  It is behavior that ignores the concept of an 'honest day's work for an honest day's pay' and replaces it with a phrase that we hear all too often today, 'I'm going to get mine.' . . . [S]hareholders and rank-and-file employees were ripped off by senior executives who rigged stock option programs – through a process called 'back-dating' – to further enrich themselves.  And as we have found far too often in corporation scandals of recent years, boards of directors were either asleep at the switch, or in some cases, willing accomplices themselves. . . ."

4.      At the Senate Finance Committee Hearing, SEC Chairman Christopher Cox, stated, "Rather obviously, this fact pattern [of backdating options] results in a violation of the SEC's disclosure rules, a violation of accounting rules, and also a violation of the tax laws."  The Commissioner of the IRS Mark Everson agreed and further stated, "Picking a date on which the stock price was low in comparison with the current price gives the employee the largest potential for gain on the option and makes it possible for the employee to benefit from corporate performance that occurred before the option was granted."

5.      In his statement before the Senate Finance Committee Deputy Attorney General Paul J. McNulty, described the practice of stock option backdating "as a brazen abuse of corporate power to artificially inflate the salaries of corporate wrongdoers at the expense of

shareholders," and said "For some of those companies that have now disclosed backdated grants, corporate reputations have been tarnished and shareholder value has diminished substantially. . . ."

6.      On September 6, 2006, *MarketWatch*, in an article titled "SEC Probing more than 100 firms on options: Cox," quoted the Senate Banking Committee Chairman, Senator Richard Shelby, saying that manipulation of options grant dates "appears to be a black-and-white example of securities fraud," and "Corporate officers and directors engaging in this practice are cheating the owners of the company and should be held accountable to the fullest extent possible."

7.      On July 22, 2006, *The San Francisco Chronicle* recounted SEC Chairman Christopher Cox's announcement in San Francisco on July 20, 2006 where he said, "[backdating in many cases] makes a hash of (companies') financial statements . . . [and is] poisonous [to efficient markets]. . . . It is securities fraud if you falsify books and records. It is securities fraud if you present financial statements to the SEC that do not comply with generally accepted accounting principles. There is no requirement that (the defendant) personally profit [to prove that a crime occurred.]"

8.      On June 18, 2006, in an article titled, "Options Scandal Brewing in Corporate World," SEC Chairman Christopher Cox was quoted, saying "[Backdating options] isn't a question about 'Whoops, I may have (accidentally) crossed a line here . . . . It's a question of knowingly betting on a race that's already been run."

9.      On May 26, 2006, *Forbes*, in an article titled, "The Next Big Scandal," quoted Former Securities and Exchange Commission ("SEC") Chairman Harvey L. Pitt, saying "What's so terrible about backdating options grants? For one thing, it likely renders a company's proxy

materials false and misleading. Proxies typically indicate that options are granted at fair market value. But if the grant is backdated, the options value isn't fair – at least not from the vantage point of the company and its shareholders."

10.     As alleged in detail herein, in gross breach of their fiduciary duties as officers and/or directors of Black Box, the Individual Defendants (as defined herein) colluded with one another to:

      a.     improperly backdate grants of Black Box stock options to Black Box's Chief Executive Officer Frederick C. Young and several other Black Box executives and directors, in violation of the Company's shareholder-approved stock option plans;

      b.     improperly record and account for the backdated stock options, in violation of Generally Accepted Accounting Principles ("GAAP");

      c.     improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)"); and

      d.     produce and disseminate false financial statements and other SEC filings to Black Box shareholders and the market that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options.

11.     As a result of the Individual Defendants' egregious misconduct, Black Box has sustained millions of dollars in damages, and the recipients of the backdated Black Box stock options have garnered millions of dollars in unlawful proceeds.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question. This Court has supplemental jurisdiction over the state

4

law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

13. Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

14. Plaintiff John L. Anderson is, and was at all relevant times, a shareholder of nominal defendant Black Box.

15. Nominal defendant Black Box is a Delaware corporation with its principal executive offices located at 1000 Park Drive, Lawrence, Pennsylvania 15055. According to its public filings, Black Box is the world's largest dedicated network infrastructure services provider.

### Officer Defendants

16. Defendant Jeffrey M. Boetticher ("Boetticher") served as a director of the Company from October 1992 to June 1998, as Chairman of the Board from November 1995 to June 1998, as Chief Executive Officer from June 1994 to June 1998, as President from June 1994 to May 1997, and as President and Chief Executive Officer of Black Box Corporation of Pennsylvania, a wholly-owned subsidiary of the Company, from March 1991 to June 1994.

17. Defendant Frederick C. Young ("F. Young") has served as the Company's Chief Executive Officer since June 1998, and as a director since December 1995. Young also served

5

as the Company's President from May 1997 to June 1998, as Senior Vice President and Chief Operating Officer from May 1996 to May 1997, and as Vice President, Chief Financial Officer, Treasurer and Secretary since joining the Company in 1991 to May 1996.

18.     Defendant Anna M. Baird ("Baird") served as the Company's Director of Corporate Compliance since December 2002.  Baird also served as the Company's Vice President, Chief Financial Officer and Treasurer from May 1997 to December 2002, as Secretary from May 2000 to December 2002, and as Director of Finance from May 1992 to May 1997.

19.     Defendant Kathleen Bullions ("Bullions") has served as the Company's Senior Vice President – North America since December 2002.  Bullions also served as the Company's Vice President of Marketing and Operations from May 1997 to December 2002, and as Director of Operations prior to May 1997.

20.     Defendant Francis Wertheimber ("Wertheimber") has served as the Company's Senior Vice President – Pacific Rim/Far East since May 2004.  Wertheimber also served as the Company's Vice President – Pacific Rim/Far East from May 1997 to May 2004, and as Managing Director of Black Box Japan from in or about 1993 to May 1997.

21.     Defendant Moacyr Sampaio ("Sampaio") served as the Company's Latin America Area Vice President from May 1997 to in or about 1998, and as director of the Company's Brazilian subsidiary prior to that.

22.     Defendant Roger E.M. Croft ("Croft") has served as the Company's Senior Vice President – Europe and Latin America since May 2004.  Croft also served as the Company's Vice President – Europe and Latin America from May 1998 to May 2004, as Vice President of European Operations from May 1997 to May 1998, and as Managing Director of Black Box U.K. prior to May 1997.  Croft has been with the Company for 21 years.

23.     Defendant Michael McAndrew ("McAndrew") has served as the Company's Vice President and Chief Financial Officer since December 2002, and as Secretary and Treasurer since January 2003.  McAndrew also served as the Company's Manager of Corporate Planning and Analysis prior to December 2002, and in various other positions since joining the Company in or about 1990.

24.     Defendant Brian D. Young ("B. Young") served as the Company's President from February 1989 to January 1992.  B. Young also served as a director of the Company from September 1988 to August 2004, as Chairperson of the Option Committee from at least 1995 to 1997, as a member of the Compensation Committee from 1997 to 2003, including as Chairman in 1998 and from 2001 to 2003, as a member of the Audit Committee from at least 1995 to 2004, including as Chairman from at least 1995 to 1998, and as a member of the Governance Committee from 2001 to 2004.

25.     Collectively, defendants Boetticher, F. Young, Baird, Bullions, Wertheimber, Sampaio, Croft, McAndrew and B. Young are referred to herein as the "Officer Defendants."

**Director Defendants**

26.     Defendant William F. Andrews ("Andrews") has served as a director of the Company since May 1992, and as a member of the Governance Committee of the Board ("Governance Committee") since 2003, including as Chairman since 2004.  Andrews also served as a member of the Compensation Committee of the Board ("Compensation Committee") from 1997 to 2003, as a member of the Option Committee of the Board ("Option Committee") (terminated and merged with the Compensation Committee in May 1997) from at least 1995 to May 1997, and as a member of the Audit Committee of the Board ("Audit Committee") from at least 1995 to 2003, including serving as Chairman from 2001 to 2003.

27.     Defendant Thomas G. Greig ("Greig") has served as a director of the Company since August 1999, as non-executive Chairman of the Board since May 2004, as a member of the Audit Committee since 2001, and as a member of the Compensation Committee since 1999, including as Chairman from 2003 to 2005.  Greig also served as a member of the Governance Committee from 2001 to 2003.

28.     Defendant William R. Newlin ("Newlin") served as a director of the Company from December 1995 to in or about August 2004, as a member of the Compensation Committee from 2003 to 2004, as a member of the Audit Committee from 1998 to 2001, and as Chairman of the Governance Committee from 2001 to 2004.

29.     Defendant Michael E. Barker ("Barker") served as a director of the Company from March 1991 to in or about August 1998, as a member of the Compensation Committee from at least 1995 to 1998, including as Chairman from at least 1995 to 1997, and as a member of the Audit Committee from at least 1995 to 1998.

30.     Defendant William Norred ("Norred") served as a director of the Company from May 1992 to in or about August 1998, and as a member of the Compensation Committee from at least 1995 to 1998.

31.     Collectively, Officer Defendants Boetticher, F. Young and B. Young, and defendants Andrews, Greig, Newlin, Barker and Norred are referred to herein as the "Director Defendants."

32.     The following chart summarizes the positions of the Director Defendants during the relevant time period of 1995 to 2002:

Case 2:05-mc-02025   Document 2011   Filed 11/16/06   Page 9 of 46

| Defendant | Recipient of Backdated Option Grants | Member of the Option or Compensation Committee at the Time of the Backdated Option Grants | Member of the Audit Committee at the Time of the Backdated Option Grants |
|---|---|---|---|
| Boetticher | x | | |
| F. Young | x | | |
| B. Young | x | x | x |
| Andrews | x | x | x |
| Greig | x | x | x |
| Newlin | x | | x |
| Barker | x | x | x |
| Norred | x | x | |

33.     Collectively, the Officer Defendants and Director Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

34.      By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.   Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

35.     The Individual Defendants, because of their positions of control and authority as

directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

36.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

   a.     exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

   b.     exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

   c.     exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits or other financial information concerning the financial condition of the Company;

   d.     exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and

   e.     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

37.     The Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.  According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing and reporting financial data, a corporation must establish an internal accounting control structure.  Among

10

other things, the Individual Defendants were required to:

> (1)  make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
>
> (2)  devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –
>
>> (a)  transactions are executed in accordance with management's general or specific authorization; and
>>
>> (b)  transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

38.     Black Box's Audit Committee Charter provides that the Audit Committee shall, among other things,

> a.  Provide independent objective oversight of the financial reporting functions and internal controls of the Company and its subsidiaries to oversee the objectivity of its financial statements;
>
> b.  Conduct quality of earnings discussions with the independent accountants and appropriate members of management, including the Chief Financial Officer and Controller; and
>
> c.  Provide a written report to the stockholders in the Company's proxy statement in its annual meeting whether the committee has satisfied its responsibilities under the committee charter.

## **FACTUAL ALLEGATIONS**

### **Backdating of Stock Option Grants to the Individual Defendants**

39.     According to Black Box's proxy statements, the Option Committee and the Compensation Committee "administer[ed] the Company's stock option plans" and "review[ed]

and approve[d] the compensation of the executive officers of the Company, and approve[d] and recommend[ed] changes to the incentive plans of the Company."

40.    From 1995 to 2002, the Option Committee and the Compensation Committee granted certain backdated Black Box stock options to the Individual Defendants, as follows:

| Purported Date of Grant | Name | Exercise Price | Number of Options[1] |
|---|---|---|---|
| 04/04/95 | Boetticher | $14.25 | 102,000 |
| | F. Young | $14.25 | 102,000 |
| 01/10/96 | Bullions | $13.63 | at least 10,000 |
| 04/23/97 | Boetticher | $21.44 | 45,000 |
| | F. Young | $21.44 | 45,000 |
| | Baird | $21.44 | 10,000 |
| | Bullions | $21.44 | 10,000 |
| | Wertheimber | $21.44 | 10,000 |
| | Sampaio | $21.44 | 10,000 |
| | Andrews | $21.44 | 1,667 |
| | Newlin | $21.44 | 1,667 |
| | Barker | $21.44 | 1,667 |
| | Norred | $21.44 | 1,667 |
| 01/13/98 | Boetticher | $30.25 | 158,060 |
| | F. Young | $30.25 | 125,000 |
| | Baird | $30.25 | 60,000 |
| | Bullions | $30.25 | 60,000 |
| | Wertheimber | $30.25 | 60,000 |
| | Sampaio | $30.25 | 50,000 |
| | Croft | $30.25 | at least 33,334 |

---

[1] Where the total number of options is unknown, *i.e.*, where the phrase at least is utilized, the stock option grant did not appear in any proxy statements filed by the Company but was first disclosed in Form 4 filings, which only included the number of options pursuant to the grant that were exercised and left unexercised on the transaction date.

| Date | Name | Price | Shares |
|---|---|---|---|
| 10/08/98 | F. Young | $21.94 | 195,000 |
| | Baird | $21.94 | 40,000 |
| | Bullions | $21.94 | 40,000 |
| | Wertheimber | $21.94 | 30,000 |
| | Croft | $21.94 | 30,000 |
| | McAndrew | $21.94 | 30,000 |
| | B. Young | $21.94 | 6,000 |
| | Newlin | $21.94 | 6,000 |
| 04/08/99 | F. Young | $32.14 | 20,000 |
| | Baird | $32.14 | 10,000 |
| | Bullions | $32.14 | 10,000 |
| 08/30/99 | F. Young | $45.06 | 30,000 |
| | Baird | $45.06 | 35,000 |
| | Bullions | $45.06 | 35,000 |
| | Wertheimber | $45.06 | 25,000 |
| | Croft | $45.06 | 35,000 |
| | B. Young | $45.06 | 5,000 |
| | Andrews | $45.06 | 5,000 |
| | Greig | $45.06 | 5,000 |
| | Newlin | $45.06 | 5,000 |
| 10/11/00 | F. Young | $42.25 | 140,402 |
| | Baird | $42.25 | 26,152 |
| | Bullions | $42.25 | 26,152 |
| | Wertheimber | $42.25 | 21,772 |
| | Croft | $42.25 | 26,817 |
| | B. Young | $42.25 | 5,002 |
| | Andrews | $42.25 | 5,002 |
| | Greig | $42.25 | 5,002 |
| | Newlin | $42.25 | 5,002 |
| 09/21/01 | F. Young | $41.45 | 195,000 |
| | Bullions | $41.45 | 50,000 |

|          | Wertheimber | $41.45 | 50,000 |
|----------|-------------|--------|--------|
|          | Croft       | $41.45 | 60,000 |
|          | B. Young    | $41.45 | 5,000  |
|          | Andrews     | $41.45 | 5,000  |
|          | Greig       | $41.45 | 5,000  |
|          | Newlin      | $41.45 | 5,000  |
| 10/09/02 | McAndrew    | $28.54 | 20,000 |

41.     Pursuant to the terms of the Company's shareholder-approved stock option plans, including the 1992 Stock Option Plan and 1992 Directors Stock Option Plan, all stock option grants must have an exercise price "not less than the fair market value of the stock on the date of grant of the option."

42.     Pursuant to APB 25, the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the date of grant exceeds the exercise price of the options, the company must recognize the difference as an expense.

43.     Pursuant to Section 162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors, (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation, and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

44.     In a striking pattern that could not have been the result of chance, the following
backdated Black Box stock option grants coincided with Black Box's lowest stock prices in their
respective fiscal years and quarters, and often immediately preceding significant stock price
increases, as demonstrated in the following charts:

a.      Stock Price Performance for the Fiscal Year Ended March 31, 1996:



b.      Stock Price Performance for the Fiscal Year Ended March 31, 1998:



c.     Stock Price Performance for the Fourth Quarter of the Fiscal Year Ended March 31, 1998:



d.     Stock Price Performance for the Fiscal Year Ended March 31, 1999:



e.   Stock Price Performance for the Fiscal Year Ended March 31, 2000:



f.   Stock Price Performance for the Second Quarter of the Fiscal Year Ended March 31, 2000:



g.    Stock Price Performance for the Fiscal Year Ended March 31, 2001:



h.    Stock Price Performance for the Third Quarter of the Fiscal Year Ended March 31, 2001:



18

i.     Stock Price Performance for the Second Quarter of the Fiscal Year Ended
       March 31, 2002:



j.     Stock Price Performance for the Third Quarter of the Fiscal Year Ended
       March 31, 2003:



45.    The reason for the extraordinary patterns set forth in the preceding paragraph is

that the purported grant dates set forth therein were not the actual dates on which the stock

option grants were made.   Rather, at the behest of the Officer Defendants, the Director

Defendants improperly backdated the stock option grants to make it appear as though the grants

were made on dates when the market price of Black Box stock was lower than the market price

on the actual grant dates. This improper backdating, which violated the terms of the Company's shareholder-approved stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options to the Individual Defendants and improperly reduced the amounts they had to pay the Company upon exercise of the options.

46. According to a statistical analysis conducted by Plaintiff, there is a 99.96% likelihood that the fortuitous pattern of option grants alleged herein was not the result of random chance. Indeed, the only explanation that is consistent with the observed pattern is that the options were backdated to coincide with favorable dates when the price of Black Box stock was particularly low.

**Defendants' Dissemination of False Financial Statements**

47. As a result of the improper backdating of stock options, the Company, with the knowledge, approval and participation of each of the Individual Defendants,

      a.      violated the terms of the Company's shareholder-approved stock option plans by granting stock options with exercise prices less than the fair market value of the stock on the actual date of grant;

      b.      violated APB by failing to recognize compensation expenses incurred when the improperly backdated options were granted;

      c.      violated Section 162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals and violated the terms of the Company's shareholder-approved stock option plans; and

      d.      produced and disseminated false financial statements to Black Box shareholders and the market that improperly recorded and accounted for the backdated option grants, and thereby understated compensation expenses and overstated net income.

48. The Company, with the knowledge, approval, and participation of each of the

20

Individual Defendants, disseminated its false financial statements in, *inter alia*, the following

Form 10-K filings:

a.  Form 10-K for the fiscal year ended March 31, 1996, filed with the SEC on July 1, 1996, and signed by defendants Boetticher, F. Young, B. Young, Andrews, Newlin, Barker and Norred;

b.  Form 10-K405 for the fiscal year ended March 31, 1997, filed with the SEC on June 27, 1997, and signed by defendants Boetticher, F. Young, Baird, B. Young, Andrews, Newlin and Norred;

c.  Form 10-K405 for the fiscal year ended March 31, 1998 filed with the SEC on June 29, 1998, and signed by defendants Boetticher, F. Young, Baird, B. Young, Andrews, Newlin and Norred;

d.  Form 10-K405 for the fiscal year ended March 31, 1999, filed with the SEC on June 24, 1999, and signed by defendants F. Young, Baird, B. Young, Andrews and Newlin;

e.  Form 10-K405 for the fiscal year ended March 31, 2000, filed with the SEC on June 29, 2000, and signed by the defendants F. Young, Baird, B. Young, Andrews, Greig and Newlin;

f.  Form 10-K405 for the fiscal year ended March 31, 2001, filed with the SEC on June 29, 2001, and signed by defendants F. Young, Baird, B. Young, Andrews, Greig and Newlin;

g.  Form 10-K for the fiscal year ended March 31, 2002 filed with the SEC on May 17, 2002, and signed by defendants F. Young, Baird, B. Young, Andrews, Greig and Newlin;

h.  Form 10-K for the fiscal year ended March 31, 2003 filed with the SEC on June 27, 2003, and signed by defendants F. Young, McAndrew, B. Young, Andrews, Greig and Newlin;

i.  Form 10-K for the fiscal year ended March 31, 2004 filed with the SEC on June 14, 2004, and signed by defendants F. Young, McAndrew, B. Young, Andrews, Greig and Newlin;

21

  j.  Form 10-K for the fiscal year ended March 31, 2005 filed with the SEC on June 14, 2005, and signed by defendants F. Young, McAndrew, Andrews and Greig; and

  k.  Form 10-K for the fiscal year ended March 31, 2006 filed with the SEC on June 14, 2006, and signed by defendants F. Young, McAndrew, Andrews and Greig.

49. Furthermore, in each of its Form 10-K Annual Reports filed with the SEC from 1996 to 2003, the Company, with the knowledge, approval and participation of each of the Individual Defendants, falsely represented that it followed APB 25 to account for stock-based compensation:

> The Company continues to apply APB Opinion No. 25 in accounting for stock-based compensation. To date, no compensation cost has been recognized as all stock options have an exercise price equal to the market price on the date of the grant. Had the Company elected to recognize compensation cost based on the fair value basis under SFAS No. 123, the Company's net income and earnings per share would have been reduced to the pro forma amounts for the years ended March 31.

50. Defendants F. Young and McAndrew filed false Certifications of Chief Executive Officer and Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (the "Certification"), certifying that each Annual Report of Black Box on Form 10-Ks "fully complies with the requirements of section 13(a) and 15(d) of the Securities Exchange Act of 1934; and the information contained in the Report fairly presents, in all material respects, the financial conduction and results of operations of the Company."  Defendants F. Young and McAndrew signed the following certifications:

  a.  for the Form 10-K for the fiscal year ended March 31, 2003, filed with the SEC on June 27, 2003;

  b.  for the Form 10-K for the fiscal year ended March 31, 2004, filed with the SEC on June 14, 2004;

Case 2:06-cv-01531-JFC   Document 1   Filed 11/16/2006   Page 23 of 46

    c.       for the Form 10-K for the fiscal year ended March 31, 2005, filed with the SEC on June 14, 2005; and

    d.       for the Form 10-K for the fiscal year ended March 31, 2006, filed with the SEC on June 14, 2006.

## Defendants' Concealment of Their Misconduct

51.    From 1996 to 2003, the Company, with the knowledge, approval and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper option backdating, disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Individual Defendants and falsely stated that options were granted to the Individual Defendants at "not less than the fair market value of the stock on the date of grant of the option," as follows:

    a.       Black Box's proxy statement filed with the SEC on July 8, 1996 falsely reported that options granted to Boetticher and F. Young were granted on April 4, 1995, and that the exercise price of these options was "not less than the fair market value of the stock on the date of grant of the option;"

    b.       Black Box's proxy statement filed with the SEC on July 6, 1998 falsely reported that options granted to Boetticher, F. Young, Baird and Bullions were granted on April 23, 1997 and January 13, 1998, and that the exercise prices of these options were "not less than the fair market value of the stock on the date of grant of the option;"

    c.       Black Box's proxy statement filed with the SEC on June 28, 1999 falsely reported that options granted to F. Young, Baird and Bullions were granted on October 8, 1998, and that the exercise price of these options was "not less than the fair market value of the stock on the date of grant of the option;"

    d.       Black Box's proxy statement filed with the SEC on July 7, 2000 falsely reported that options granted to F. Young, Baird and Bullions were granted on April 8, 1999 and August 30, 1999, and that the exercise prices of these

options were "not less than the fair market value of the stock on the date of grant of the option;"

e.  Black Box's proxy statement filed with the SEC on July 10, 2001 falsely reported that options granted to F. Young, Baird and Bullions were granted on October 11, 2000, and that the exercise price of these options was "not less than the fair market value of the stock on the date of grant of the option;"

f.  Black Box's proxy statement filed with the SEC on July 3, 2002 falsely reported that options granted to F. Young and Bullions were granted on September 21, 2001, and that the exercise price of these options was "not less than the fair market value of the stock on the date of grant of the option;" and

g.  Black Box's proxy statement filed with the SEC on July 1, 2003 falsely reported that options granted to McAndrew were granted on October 9, 2002, and that the exercise price of these options was "not less than the fair market value of the stock on the date of grant of the option."

52.  Moreover, in the Reports of the Compensation Committee of the Board in the Company's proxy statements filed between 1996 and 2003, Black Box falsely stated that its total executive compensation package was designed to "facilitate the achievement of short- and long-range Company goals, to recognize individual executive performance and contribution, and to promote increased value creation for the Company's stockholders."

53.  From 2004 to 2005, Black Box, with the knowledge, approval and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper stock option backdating, filed with the SEC Form 4s that falsely reported the dates of Black Box stock option grants to the Individual Defendants, as follows:

      a.      F. Young's Form 4 filed with the SEC on May 28, 2004 falsely reported that options granted to F. Young had been granted on April 4, 1995;

      b.      Bullions' Form 4 filed with the SEC on May 27, 2004 falsely reported that options granted to Bullions had been granted on January 10, 1996;

      c.      Wertheimber's Form 4 filed with the SEC on January 23, 2004 falsely reported that options granted to Wertheimber had been granted on April 23, 1997;

      d.      Croft's Form 4 filed with the SEC on August 4, 2005 falsely reported that options granted to Croft had been granted on January 13, 1998;

      e.      Wertheimber's Form 4 filed with the SEC on January 23, 2004 falsely reported that options granted to Wertheimber had been granted on January 13, 1998;

      f.      Croft's Form 4 filed with the SEC on August 4, 2005 falsely reported that options granted to Croft had been granted on October 8, 1998;

      g.      McAndrew's Form 4 filed with the SEC on January 23, 2004 falsely reported that options granted to McAndrew had been granted on October 8, 1998;

      h.      Wertheimber's Form 4 filed with the SEC on January 23, 2004 falsely reported that options granted to Wertheimber had been granted on October 8, 1998; and

      i.      McAndrew's Form 4 filed with the SEC on May 26, 2004 falsely reported that options granted to McAndrew had been granted on October 9, 2002.

54.      The Individual Defendants continued to conceal their foregoing conduct from the investing public until the filing of this Complaint.

**Individual Defendants' Insider Selling**

55.     During the relevant period, certain of the Individual Defendants, while in possession of materially adverse non-public information regarding the backdating of stock options and the false financial statements resulting therefrom, sold almost $27 million of Black Box stock, a significant portion of which was obtained through the exercise of improperly backdated Black Box stock options, as follows:

a.      F. Young received approximately $13,107,168.50 from the sale of Black Box stock;

b.      Bullions received approximately $2,237,160.00 from the sale of Black Box stock;

c.      Wertheimber received approximately $4,089,491.55 from the sale of Black Box stock;

d.      Croft received approximately $5,395,376.00 from the sale of Black Box stock;

e.      McAndrew received approximately $780,127.80 from the sale of Black Box stock;

f.      B. Young received approximately $1,130,726.00 from the sale of Black Box stock; and

g.      Andrews received approximately $178,365.08 from the sale of Black Box stock.

**BLACK BOX'S FALSE FINANCIAL REPORTING IN VIOLATION OF
GAAP, SEC REGULATIONS AND IRS RULES AND REGULATIONS**

56.     As a result of the Individual Defendants' improper backdating of stock options, the Individual Defendants caused Black Box to violate GAAP, SEC regulations and IRS rules and regulations.

57.     Black Box's financial results for 1995 through 2006 were included in reports filed

with the SEC and in other shareholder reports. In these reports, the Individual Defendants represented that Black Box's financial results were presented in a fair manner and in accordance with GAAP.

58.     The Individual Defendants' representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information "a fair presentation" of the Company's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

59.     GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC, which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate.

**Violations of GAAP**

60.     During the relevant period, the Individual Defendants caused the Company to understate its compensation expenses by not properly accounting for its stock options under GAAP and thus overstated the Company's net earnings.

61.     Under well-settled accounting principles in effect throughout the relevant period, Black Box did not need to record an expense for options granted to employees at the current market price ("at the money").  The Company was, however, required to record an expense in its financial statements for any options granted below the current market price ("in the money").  In order to provide Black Box executives and employees with far more lucrative "in the money"

27

options, while avoiding having to inform shareholders about millions of dollars incurred by the Company in compensation expenses (and without paying the IRS millions of dollars in employment taxes), the Individual Defendants systematically falsified Company records to create the false appearance that options had been granted at the market price on an earlier date.

62.     Throughout the relevant period, Black Box accounted for stock options using the intrinsic method described in APB No. 25, "Accounting for Stock Issued to Employees."  Under APB No. 25, employers were required to record as an expense on their financial statements the "intrinsic value" of a fixed stock option on its "measurement date."  An option that is in-the-money on the measurement date has intrinsic value, and the difference between its exercise price and the quoted market price must be recorded as compensation expense to be recognized over the vesting period of the option.  Options that are at-the-money or out-of-the-money on the measurement date need not be expensed.  Excluding non-employee directors, APB No. 25 required employers to record compensation expenses on options granted to non-employees irrespective of whether they were in-the-money or not on the date of grant.

### Black Box's GAAP Violations Were Material

63.     Black Box's false and misleading relevant period statements and omissions regarding its accounting were material, particularly in light of SEC guidance on materiality. SEC Staff Accounting Bulletin ("SAB") Topic 1M, Materiality, summarizes GAAP definitions of materiality.  Among other items, SAB Topic 1M says: "A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important."  It also stresses that materiality requires qualitative, as well as quantitative, considerations.  For example, if a known misstatement would cause a significant market reaction, that reaction should be taken into account in determining the materiality of the misstatement.

64.     SAB Topic 1M further states:

>      Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are –
>
> \*        \*        \*
>
> whether the misstatement masks a change in earnings or other trends
>
> whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise
>
> \*        \*        \*
>
> whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.

65.     SAB Topic 1M also says that an intentional misstatement of even immaterial items may be illegal and constitute fraudulent financial reporting.

66.     Black Box's misstatements satisfy these criteria and thus were material from both a quantitative and qualitative perspective.

### Black Box's Financial Statements Violated Fundamental Concepts of GAAP

67.     Due to these accounting improprieties, the Company presented its financial results and statements in a manner that violated GAAP, which are described by the following statements:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10);

(b)     The principle that financial reporting should provide information that is useful to existing and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and

claims to those resources (Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1, ¶40);

(d)  The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)  The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

(f)  The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79); and

(g)  The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶95, 97).

68.  Further, the undisclosed adverse information concealed by the Individual Defendants during the relevant period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## **Black Box's Financial Statements Violated SEC Regulations**

69.  During the relevant period, the Individual Defendants caused Black Box to violate SEC regulations by failing to disclose that the Company's senior executives had been granted backdated stock options.

70.  Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an

issuer must furnish information required by Item 402 of Regulation S-K [17 C.F.R. §229.303].

Item 402(b) and (c) require a company to provide both a Summary Compensation Table and an

Option/SAR Grants table identifying the compensation of the named executive officers – the

Company's CEO and its next four most highly paid executives.   Item 402 requires particularized

disclosures involving a company's stock option grants in the last fiscal year.   In the summary

compensation table, the issuer must identify in a column "other annual compensation" received

by the named executives that is not properly categorized as salary or bonus, including any

"[a]bove market or preferential earnings on restricted stock, options, SARs or deferred

compensation" paid to the officer during the period.   Item 402(b)(2)(iii)(C)(2).   In the option

grant table, the issuer must identify in a column "[t]he per-share exercise or base price of the

options. . . . If such exercise or base price is less than the market price of the underlying security

on the date of grant, a separate, adjoining column shall be added showing market price on the

date of grant. . . ."  Item 402(c)(2)(iv).

71.     The Individual Defendants caused Black Box to violate SEC regulations by

failing to disclose that the Company's named executive officers had been granted options with

exercise prices below the market value on the date the Board, the Option Committee or the

Compensation Committee approved the grant.

### Black Box's Violations of IRS Rules and Regulations

72.     During the relevant period, the Individual Defendants further caused Black Box to

violate IRS rules and regulations due to its improper accounting for the backdated stock options.

As a result, the Company's tax liabilities were understated, exposing Black Box to potential

amounts owed for back taxes, penalties and interest to the IRS for improperly reporting

compensation.

31

73.     The Individual Defendants caused the Company to violate IRS Code §162(m), which generally limits a publicly traded company's tax deductions for compensation paid to each of its named executive officers to $1 million unless the pay is determined to be "performance-based."  In order for compensation to be performance-based, the Compensation Committee must have set pre-established and objective performance goals.  The goals must then be approved by the shareholders. Section 162(m) defines stock options as performance-based provided they are issued at an exercise price that is no less than the fair market value of the stock on the date of the grant.  Accordingly, properly issued stock options do not have to be taken into account in calculating whether an executive's compensation has exceeded the $1 million compensation cap.

74.     Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie top executives' soaring pay packages more closely to a company's performance.  This change in the tax law turned compensation practices for a company's top executives away from straight salary-based compensation to performance-based compensation, including stock options. According to former SEC Chairman Harvey Pitt: "What [162[m]] did was create incentives to find other forms of compensation so people could get over the $1 million threshold without running afoul of the code."

75.     The Individual Defendants caused Black Box to violate IRS Code §162(m) by providing backdated options to the Company's named executive officers, which were granted with exercise prices that were less than the fair market value of the stock on the date of the grant. As a result all of the income resulting from the exercise of the options must be included for purposes of calculating whether the named executive's compensation exceeds the $1 million cap for federal tax purposes.

76.    The Individual Defendants further caused the Company to violate IRS rules and regulations in order to avoid having to withhold income and FICA tax from its executives and employees upon the exercise of Black Box's stock options by improperly accounting for its Nonqualified Stock Options ("NSOs") as Incentive Stock Options ("ISOs").

77.    ISOs are a form of equity compensation that may be provided to a company's employees.  ISOs are required to be granted at an exercise price that is no less than the fair market value of the stock on the date of the grant and are entitled to preferential tax treatment as they are not subject to income tax upon exercise of the options but only upon sale of the stock (except for the possible imposition of alternative minimum tax on the option spread at the time of exercise).  Stock options that do not qualify as ISOs are considered to be NSOs.  NSOs are not entitled to preferential treatment as they are subject to income tax and FICA withholding upon exercise.  As a result, a company that fails to withhold income tax and/or FICA upon the exercise of NSOs by its employees would be liable for the amount of the income tax and FICA that the company failed to withhold upon exercise of the options, in addition to interest and penalties.

78.    By improperly treating its backdated options as ISOs, the Individual Defendants failed to provide proper income tax and FICA withholdings upon the exercise of its options by its executives and employees in violation of IRS rules and regulations.

79.    The chart below illustrates Black Box's false and misleading fiscal year financial results which materially understated its compensation expenses and thus overstated its earnings:

| Fiscal Year Ended | Reported Net Income (Loss) | Reported Net Income (Loss) Per Share |
|---|---|---|
| March 31, 1996 | $18.697 million | $1.10 |
| March 31, 1997 | $24.792 million | $1.40 |
| March 31, 1998 | $32.404 million | $1.79 |
| March 31, 1999 | $38.145 million | $2.09 |
| March 31, 2000 | $48.852 million | $2.60 |
| March 31, 2001 | $64.190 million | $3.22 |
| March 31, 2002 | $62.042 million | $2.97 |
| March 31, 2003 | $48.685 million | $2.39 |
| March 31, 2004 | $47.243 million | $2.52 |
| March 31, 2005 | $29.912 million | $1.68 |
| March 31, 2006 | $37.358 million | $2.13 |

80.     Meanwhile, the Individual Defendants were causing the Company to grant them millions of backdated Black Box stock options.   The Company's executives received a significant number of backdated Black Box stock options as compensation during the relevant period.

81.     Moreover, as alleged herein, in the Reports of the Compensation Committee of the Board in the Company's proxy statements filed between 1996 and 2003, Black Box falsely stated that its total executive compensation package was designed to "facilitate the achievement of short- and long-range Company goals, to recognize individual executive performance and contribution, and to promote increased value creation for the Company's stockholders."

### INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

82.     In a misguided effort to attract and retain employees in a competitive environment, the Individual Defendants exceeded the bounds of the law and legitimate business judgment by perpetrating their backdating scheme.  The Individual Defendants' misconduct was

34

unjustifiable and constituted a gross breach of their fiduciary duties as officers and/or directors of the Company. Specifically, the Individual Defendants breached their fiduciary duties by:

a.    colluding with each other to backdate stock option grants;

b.    colluding with each other to violate GAAP and Section 162(m);

c.    colluding with each other to produce and disseminate to Black Box shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

d.    colluding with each other to file false proxy statements, false financial statements and false Form 4s in order to conceal the improper backdating of stock options.

83.    The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Individual Defendants at the expense of the Company.

84.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company will be required to incur, and the loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grant.

85.    As alleged herein, certain of the Individual Defendants have exercised hundreds of thousands of Black Box backdated stock options at improperly low prices and have then sold the shares for substantial profits. Consequently, the Individual Defendants have been unjustly enriched by garnering millions of dollars in illicit profits and depriving the Company of millions of dollars in payments that the Company should have received upon exercise of the options.

**DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS**

86.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

87.     Plaintiff is an owner of Black Box common stock and was an owner of Black Box common stock at all times relevant hereto.

88.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

89.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Black Box Board to institute this action against the Individual Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

90.     The Board currently consists of six directors: defendants F. Young, Andrews and Greig, and directors Thomas W. Golonski, Richard L. Crouch and Edward A. Nicholson.  The following directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action:

> a.     F. Young, because he is directly interested in the improperly backdated stock option grants complained of herein as a recipient of the backdated stock option grants, and because his principal professional occupation is his position as Chief Executive Officer of the Company.  In his position as Chief Executive Officer, F. Young stands to earn hundreds of thousands of dollars in annual salary, bonuses, and other compensation, all of which must be approved by Defendant Greig who is currently a member of the Compensation Committee.  Accordingly, F. Young is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against the Individual Defendants;

36

b.  Andrews and Greig, because they are directly interested in the improperly backdated stock option grants complained of herein as recipients of the backdated stock option grants. Accordingly, Andrews and Greig are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against the Individual Defendants;

c.  Andrews and Greig, because as members of the Compensation Committee, they directly participated in and approved the misconduct alleged herein and are substantially likely to be held liable for breaching their fiduciary duties, as alleged herein. Moreover, by colluding with the Officer Defendants, as alleged herein, Andrews and Greig have demonstrated that they are unable or unwilling to act independently of the Officer Defendants;

d.  Andrews and Greig, because as members of the Audit Committee they directly participated in and approved the misconduct alleged herein and are substantially likely to be held liable for breaching their fiduciary duties, as alleged herein. Moreover, by colluding with the Officer Defendants, as alleged herein, Andrews and Greig have demonstrated that they are unable or unwilling to act independently of the Officer Defendants; and

e.  F. Young, Andrews and Greig, because as directors of the Company they directly participated in and approved the Company's filing of false financial statements and other SEC filings, as alleged herein. Moreover, by colluding with the Officer Defendants and others, as alleged herein, F. Young, Andrews and Greig have demonstrated that they are unable or unwilling to act independently of the Officer Defendants.

91.  Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment. As represented in Black Box's proxy statements, the stated purpose of the Company's shareholder-approved stock option plans is to "strengthen the Company's ability to retain key employees and motivate such employees to remain focused on long-term stockholder value performance . . . thereby, aligning their financial goals with those of the stockholders." However, by granting options with

backdated exercise prices, the Individual Defendants undermined the purpose of the stock option plans by awarding employees compensation that had intrinsic value regardless of Black Box's stock performance.  In effect, this practice was nothing more than secret handouts to executives and employees at the expense of unsuspecting shareholders.

92.    The Individual Defendants could have achieved the stated purpose of "strengthen[ing] the Company's ability to retain key employees and motivat[ing] such employees to remain focused on long-term stockholder value performance" by granting those employees additional options under their incentive plans, or by granting options at a price less than the fair market value on the date of the grant and simply disclosing and expensing these grants.  Instead, the Individual Defendants were motivated and retained Black Box's employees by backdating option grants in violation of the Company's shareholder-approved stock option plans and improperly reporting these grants in their financial disclosures to improve their bottom line.

93.    The practice of backdating stock options is *ultra vires* and cannot be a valid exercise of business judgment because it has subjected Black Box to potentially massive liability. Black Box will likely suffer tax liabilities for the additional compensation it will have to expense, and it has tarnished its reputation in the investment community through this deliberate and calculated conduct.

## COUNT I

### Against the Individual Defendants for
### Violations of §10(b) and Rule 10b-5 of the Securities and Exchange Act

94.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

38

95.     Throughout the relevant period, the Individual Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, intentionally or recklessly employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business which operated as a fraud and deceit upon the Company.

96.     The Individual Defendants, as top executive officers and/or directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers and/or directors of the Company, each of the Individual Defendants was able to and did control the conduct complained of herein.

97.     The Individual Defendants acted with scienter in that they either had actual knowledge of the fraud set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were among the senior management and/or directors of the Company and were therefore directly responsible for the fraud alleged herein.

98.     The Company relied upon the Individual Defendants' fraud in granting the Individual Defendants options to purchase shares of the Company's common stock, as alleged herein.

99.     As a direct and proximate result of the Individual Defendants' fraud, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company will be required to incur, and the loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grant.

## COUNT II

### Against the Individual Defendants for
### Violations of §14(a) of the Securities Exchange Act

100.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

101.    Rule 14-A-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14-A-9.

102.    The proxy statements described herein violated §14(a) and Rule 14-A-9 because they omitted material facts, including the fact that the Individual Defendants were causing Black Box to engage in an option backdating scheme, a fact which the Individual Defendants were aware of and participated in from at least 1995.

103.    In the exercise of reasonable care, the Individual Defendants should have known that the proxy statements were materially false and misleading.

104.    The misrepresentations and omissions in the proxy statements were material.  The proxy statements were an essential link in the accomplishment of the continuation of the Individual Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of the shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

105.    The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

40

Case 2:06-cv-01531-JFC   Document 11   Filed 11/16/2006   Page 41 of 46

## COUNT III

### Against Boetticher, F. Young, Baird, McAndrew and the Director Defendants for Violations of §20(a) of the Securities Exchange Act

106.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

107.    Boetticher, F. Young, Baird, McAndrew and the Director Defendants, by virtue of their positions with Black Box and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Black Box within the meaning of §20(a) of the Exchange Act. They had the power and influence and exercised the same to cause Black Box to engage in the illegal conduct and practices complained of herein.

## COUNT IV

### Against the Individual Defendants for Accounting

108.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

109.    As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

110.    As alleged in detail herein, the Individual Defendants breached their fiduciary duties by, among other things, engaging in a scheme to grant backdated stock options to themselves and/or certain other officers and directors of the Company and cover up their misconduct.

111.    The Individual Defendants possess complete and unfettered control over their improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants.

112.    As a result of the Individual Defendants' misconduct, Black Box has been damaged financially and is entitled to a recovery as a result thereof.

113.    Plaintiff demands an accounting be made of all stock option grants made to any of the Officer Defendants, including, but not limited to, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the dates the stock options were exercised, as well as the disposition of any proceeds received by any of the Officer Defendants via sale or other exercise of the grants.

## COUNT V

### Against the Individual Defendants for
### Breach of Fiduciary Duty and/or Aiding and Abetting

114.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

115.    As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

116.    As alleged in detail herein, the Individual Defendants breached their fiduciary duties by, among other things, engaging in a scheme to grant backdated stock options to themselves and/or certain other officers and directors of the Company and cover up their misconduct.

117.     In breach of their fiduciary duties of loyalty and good faith, the Individual Defendants agreed to and did participate with and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets to themselves and/or other Company insiders.

118.     The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to and did, unduly benefit the Officer Defendants at the expense of the Company.

119.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company will be required to incur, and the loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grant.

## COUNT VI

### Against the Officer Defendants for
### Unjust Enrichment

120.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

121.     The Officer Defendants were unjustly enriched by their receipt and retention of backdated stock option grants and the proceeds they received through exercising backdated Black Box stock options, as alleged herein and it would be unconscionable to allow them to retain the benefits thereof.

43

122.    To remedy the Officer Defendants' unjust enrichment, the Court should order them to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged or otherwise monetized.

## COUNT VII

### Against the Officer Defendants for Rescission

123.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

124.    As a result of the acts alleged herein, the stock option contracts between the Officer Defendants and the Company entered into during the relevant period were obtained through the Individual Defendants' fraud, deceit and abuse of control.  Further, the backdated Black Box stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the Company's shareholder-approved stock option plans.

125.    All contracts which provide for stock option grants to the Officer Defendants and were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executor contracts cancelled and declared void.

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' misconduct;

B.    Ordering the Officer Defendants to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged or otherwise monetized, and imposing a constructive trust thereover;

44

C.   Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties;

D.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.   Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

Dated: November 16, 2006                 Respectfully submitted,

                                         LAW OFFICE OF ALFRED G. YATES JR., PC

                                         By:   /s/ Alfred G. Yates, Jr.
                                               Alfred G. Yates, Jr. (PA17419)
                                               Gerald L. Rutledge (PA62027)
                                               519 Allegheny Building
                                               429 Forbes Avenue
                                               Pittsburgh, PA  15219
                                               Telephone:  412/391-5164
                                               Email: *yateslaw@aol.com*

                                         SCHIFFRIN & BARROWAY, LLP
                                         Eric L. Zagar
                                         Michael Hynes
                                         Tara Kao
                                         Bradley A. Dirks
                                         280 King of Prussia Road
                                         Radnor, PA 19087
                                         Telephone: (610) 667-7706

                                         *Attorneys for Plaintiff*

45

## BLACK BOX CORPORATION VERIFICATION

I, John L. Anderson, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief.


DATE: __10-31-06__          _____
                           SIGNATURE