## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re BLACK BOX CORPORATION | ) | |
| DERIVATIVE LITIGATION | ) | No. 2:06-CV-01531 TMH |
| | ) | |
| This Document Relates to: All Actions | ) | |
| | ) | |
| | ) | ***Electronically Filed*** |

### CONSOLIDATED VERIFIED
### SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs, John L. Anderson ("Anderson") and Steve Leisy ("Leisy") (collectively, "Derivative Plaintiffs" or "Plaintiffs"), by and through their undersigned attorneys, derivatively on behalf of Black Box Corporation ("Black Box" or the "Company"), allege, upon personal knowledge as to themselves and their own acts, and upon information and belief and in reliance on the investigation of their counsel as to all other matters, as follows:

### NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder's derivative action brought for the benefit of nominal defendant Black Box against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment, statutory violations and other violations of state and federal law.

2.      This action arises from the Individual Defendants'(as defined herein) repeated and egregious breaches of their fiduciary duties to the Company and its shareholders by approving and/or acquiescing in the issuance of Black Box stock options to Company employees and directors that were unlawfully "backdated" to provide the recipients with windfall compensation at the direct expense of the Company.

3.      A stock option is the right to purchase a stock for a specified period of time at a fixed price, called the "exercise price" or "strike price."  The exercise price is generally fixed to

1

the market price of the stock on the date of grant.  If the stock's market price exceeds the exercise price, the option holder may exercise the stock option, by purchasing the stock from the Company at the exercise price, and resell it at the higher market price, profiting from the difference.

4.      When the grant date of a stock option is manipulated to an earlier date on which the stock closed at a lower price – *i.e.*, when the stock option is "backdated" – the grantee pays less for the stock and the corporation, the counterparty to the stock option grant, receives less when the stock option is exercised.  When stock options are backdated in this manner for the benefit of insiders (as they were in this case), the stated purpose behind a stock option plan – to strengthen the Company's ability to retain key employees and motivate such employees to remain focused on long-term stockholder value performance – is undermined to the detriment of the Company and its shareholders, because the stock options are already "in the money"[1] when granted.  Backdating stock option grants thus represents a direct and continuing waste of valuable corporate assets.

5.      To achieve the Company's stated goal of strengthening the Company's ability to retain key employees and motivating such employees to remain focused on long-term stockholder value performance, Black Box's shareholder-approved stock option plans provide that the exercise price of a stock option cannot be *less* than the fair market value of the stock on the date of grant of the option.  At Black Box, however, the Individual Defendants blatantly violated this and other provisions of the Company's stock option plans by backdating Black Box stock options in order to illegally maximize the grantees' profits.  As such, and as detailed

---

[1]"In the money" refers to when the exercise price of a stock option is below the market price of the underlying stock. *See* infra.

below, the Individual Defendants' acts were *ultra vires* – unauthorized and beyond the scope of power granted to them.

6.     On September 6, 2006, the United States Senate Committee on Finance held a hearing entitled "Executive Compensation: Backdating to the Future/Oversight of current issues regarding executive compensation including backdating of stock options; and tax treatment of executive compensation, retirement and benefits."

7.     At the Senate Finance Committee Hearing, the Senate Finance Committee Chairman, Senator Chuck Grassley, stated: "[Options backdating] is behavior that, to put it bluntly, is disgusting and repulsive.  It is behavior that ignores the concept of an 'honest day's work for an honest day's pay' and replaces it with a phrase that we hear all too often today, 'I'm going to get mine.' . . . [S]hareholders and rank-and-file employees were ripped off by senior executives who rigged stock option programs – through a process called 'back-dating' – to further enrich themselves.  And as we have found far too often in corporation scandals of recent years, boards of directors were either asleep at the switch, or in some cases, willing accomplices themselves. . . ."

8.     At the Senate Finance Committee Hearing, United States Securities and Exchange Commission ("SEC") Chairman Christopher Cox, stated, "Rather obviously, this fact pattern [of backdating options] results in a violation of the SEC's disclosure rules, a violation of accounting rules, and also a violation of the tax laws."  Mark Everson, the Commissioner of the IRS, agreed and further stated, "Picking a date on which the stock price was low in comparison with the current price gives the employee the largest potential for gain on the option and makes it possible for the employee to benefit from corporate performance that occurred before the option was granted."

9.     In his statement before the Senate Finance Committee Deputy Attorney General Paul J. McNulty, described the practice of stock option backdating "as a brazen abuse of corporate power to artificially inflate the salaries of corporate wrongdoers at the expense of shareholders," and said "For some of those companies that have now disclosed backdated grants, corporate reputations have been tarnished and shareholder value has diminished substantially. . . ."

10.     On September 6, 2006, *MarketWatch*, in an article titled "SEC Probing more than 100 firms on options: Cox," quoted the Senate Banking Committee Chairman, Senator Richard Shelby, saying that manipulation of options grant dates "appears to be a black-and-white example of securities fraud," and "Corporate officers and directors engaging in this practice are cheating the owners of the company and should be held accountable to the fullest extent possible."

11.     On July 20, 2006, in a press conference announcing the SEC's decision to file civil and criminal charges for stock option backdating against Brocade Communications Systems, SEC Chairman Cox described the importance of "stamp[ing] out fraudulent stock option backdating."  Chairman Cox emphasized that "[t]his issue is important because it goes to the heart of the relationship between a corporation and its shareholders.  In order for our system of public ownership to work, the interests of shareholders, and not the personal interests of the company's management or its directors, must be paramount.  The proper use of options for compensation can be an important tool for companies that produces tangible benefits for shareholders.  But options backdating strikes at the heart of investor confidence in our capital markets.  It deceives investors and the market as a whole about the financial health of companies

4

that cheat in this way.  It understates a company's compensation expenses and overstates the company's income."

12.    SEC Chairman Cox continued at that press conference by stating that, "[backdating in many cases] makes a hash of (companies') financial statements . . . [and is] poisonous [to efficient markets]. . . .  It is securities fraud if you falsify books and records.  It is securities fraud if you present financial statements to the SEC that do not comply with generally accepted accounting principles.  There is no requirement that (the defendant) personally profit [to prove that a crime occurred.]"

13.    On June 18, 2006, in an article titled "Options Scandal Brewing in Corporate World," SEC Chairman Christopher Cox was quoted, saying "[Backdating options] isn't a question about 'Whoops, I may have (accidentally) crossed a line here . . . .  It's a question of knowingly betting on a race that's already been run."

14.    On May 26, 2006, *Forbes*, in an article titled, "The Next Big Scandal," quoted Former SEC Chairman Harvey L. Pitt, saying "What's so terrible about backdating options grants?  For one thing, it likely renders a company's proxy materials false and misleading.  Proxies typically indicate that options are granted at fair market value.  But if the grant is backdated, the options value isn't fair – at least not from the vantage point of the company and its shareholders."

15.    Moreover, as the *Wall Street Journal* explained on December 12, 2006, in an article entitled "How Backdating Helped Executives Cut Their Taxes," many corporate insiders have manipulated stock option grant dates *for the additional purpose of cheating on their income taxes*.  Far more often than not, stock option grant recipients immediately sell the shares they buy when they exercise stock options, and are required to pay ordinary income tax, as well

as payroll taxes, on the difference between the stock's value on the date the stock option was exercised and the stock option's strike price.  The highest federal marginal income tax rate is 35%.  However, those insiders who hold shares for at least a year will pay a much lower capital gains tax – currently 15% – on any profit between the time they exercise and when they eventually dispose of the shares.  This substantially lower tax rate provides an obvious incentive to exercise stock options at a relative low point in the stock price.  As the *Wall Street Journal* explained:

> Consider an executive who holds options on 100,000 shares with a strike price of $10.  If he exercises and sells when the price is $20, he realizes $1 million in income and must pay $350,000 in income taxes.
>
> If he instead can claim an exercise price of $16, he lowers his income tax to $210,000.  If he then sells a year later and the stock is at the same price of $20, he pays $60,000 in capital-gains levies, for a total tax bite of $270,000.  ***In other words, he has the same $1 million gain but saves $80,000 in taxes***.

16.     As alleged in detail herein, in gross breach of their fiduciary duties as officers and/or directors of Black Box, the Individual Defendants (as defined herein) colluded with one another to:

    a.    improperly backdate grants of Black Box stock options to Black Box's Chief Executive Officer ("CEO") Frederick C. Young and several other Black Box executives and directors, in violation of the Company's shareholder-approved stock option plans;

    b.    improperly record and account for the backdated stock options, in violation of Generally Accepted Accounting Principles ("GAAP");

    c.    improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)"); and

      d.     produce and disseminate false financial statements and other SEC filings to Black Box shareholders and the market that improperly recorded and accounted for the backdated stock option grants and concealed the improper backdating of stock options.

17.    As a result of the Individual Defendants' egregious misconduct, Black Box has sustained millions of dollars in damages, and the recipients of the backdated Black Box stock options have garnered millions of dollars in unlawful proceeds.

## JURISDICTION AND VENUE

18.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

19.    Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

20.    Derivative Plaintiffs, John L. Anderson and Steve Leisy, are, and were at all relevant times, shareholders of nominal defendant Black Box.

21.    Nominal defendant Black Box is a Delaware corporation with its principal executive offices located at 1000 Park Drive, Lawrence, Pennsylvania 15055.  According to its public filings, Black Box is the world's largest dedicated network infrastructure services

provider.

## Officer Defendants

22.     Defendant Jeffrey M. Boetticher ("Boetticher") served as a director of the Company from October 1992 to June 1998, as Chairman of the Board from November 1995 to June 1998, as CEO from June 1994 to June 1998, as President from June 1994 to May 1997, and as President and CEO of Black Box Corporation of Pennsylvania, a wholly-owned subsidiary of the Company, from March 1991 to June 1994.

23.     Defendant Frederick C. Young ("F. Young") has served as the Company's CEO since June 1998, and as a director since December 1995.  Young also served as the Company's President from May 1997 to June 1998, as Senior Vice President and Chief Operating Officer from May 1996 to May 1997, and as Vice President, Chief Financial Officer ("CFO"), Treasurer and Secretary since joining the Company in 1991 to May 1996.

24.     Defendant Anna M. Baird ("Baird") served as the Company's Director of Corporate Compliance since December 2002.  Baird also served as the Company's Vice President, CFO and Treasurer from May 1997 to December 2002, as Secretary from May 2000 to December 2002, and as Director of Finance from May 1992 to May 1997.

25.     Defendant Kathleen Bullions ("Bullions") has served as the Company's Senior Vice President – North America since December 2002.  Bullions also served as the Company's Vice President of Marketing and Operations from May 1997 to December 2002, and as Director of Operations prior to May 1997.

26.     Defendant Francis Wertheimber ("Wertheimber") has served as the Company's Senior Vice President – Pacific Rim/Far East since May 2004.  Wertheimber also served as the Company's Vice President – Pacific Rim/Far East from May 1997 to May 2004, and as

8

Managing Director of Black Box Japan from in or about 1993 to May 1997.

27.     Defendant Moacyr Sampaio ("Sampaio") served as the Company's Latin America Area Vice President from May 1997 to in or about 1998, and as director of the Company's Brazilian subsidiary prior to that.

28.     Defendant Roger E.M. Croft ("Croft") has served as the Company's Senior Vice President – Europe and Latin America since May 2004.  Croft also served as the Company's Vice President – Europe and Latin America from May 1998 to May 2004, as Vice President of European Operations from May 1997 to May 1998, and as Managing Director of Black Box U.K. prior to May 1997.  Croft has been with the Company for 21 years.

29.     Defendant Michael McAndrew ("McAndrew") has served as the Company's Vice President and CFO since December 2002, and as Secretary and Treasurer since January 2003. McAndrew also served as the Company's Manager of Corporate Planning and Analysis prior to December 2002 and in various other positions since joining the Company in or about 1990.

30.     Defendant Brian D. Young ("B. Young") served as the Company's President from February 1989 to January 1992.  B. Young also served as a director of the Company from September 1988 to August 2004, as Chairperson of the Option Committee of the Board ("Option Committee") (terminated and merged with the Compensation Committee in May 1997) from at least 1995 to 1997, as a member of the Compensation Committee of the Board ("Compensation Committee") from 1997 to 2003, including as Chairman in 1998 and from 2001 to 2003, as a member of the Audit Committee of the Board ("Audit Committee") from at least 1995 to 2004, including as Chairman from at least 1995 to 1998, and as a member of the Governance Committee of the Board ("Governance Committee") from 2001 to 2004.

31.     Collectively, defendants Boetticher, F. Young, Baird, Bullions, Wertheimer,

Sampaio, Croft, McAndrew and B. Young are referred to herein as the "Officer Defendants."

### Director Defendants

32.     Defendant William F. Andrews ("Andrews") has served as a director of the Company since May 1992, and as a member of the Governance Committee since 2003, including as Chairman since 2004.  Andrews also served as a member of the Compensation Committee from 1997 to 2003, as a member of the Option Committee from at least 1995 to May 1997, and as a member of the Audit Committee from at least 1995 to 2003, including serving as Chairman from 2001 to 2003.

33.     Defendant Thomas G. Greig ("Greig") has served as a director of the Company since August 1999, as non-executive Chairman of the Board since May 2004, as a member of the Audit Committee since 2001, and as a member of the Compensation Committee since 1999, including as Chairman from 2003 to 2005.  Greig also served as a member of the Governance Committee from 2001 to 2003.

34.     Defendant William R. Newlin ("Newlin") served as a director of the Company from December 1995 to in or about August 2004, as a member of the Compensation Committee from 2003 to 2004, as a member of the Audit Committee from 1998 to 2001, and as Chairman of the Governance Committee from 2001 to 2004.

35.     Defendant Michael E. Barker ("Barker") served as a director of the Company from March 1991 to in or about August 1998, as a member of the Compensation Committee from at least 1995 to 1998, including as Chairman from at least 1995 to 1997, and as a member of the Audit Committee from at least 1995 to 1998.

36.     Defendant Ronald D. Fisher ("Fisher") served as a director of the Company from May 1992 to 1997.  Fisher also served as a member of the Compensation Committee from at

least 1995 to 1997.

37.     Collectively, Officer Defendants Boetticher, F. Young and B. Young, and defendants Andrews, Greig, Newlin, Barker and Fisher are referred to herein as the "Director Defendants."

38.     Collectively, the Officer Defendants and Director Defendants are referred to herein as the "Individual Defendants."

39.     As executive officers and/or Board members, the Individual Defendants approved and received the backdated Black Box stock options at issue in this case.  The Individual Defendants assisted in the preparation of Black Box's annual and quarterly reports from 1996 through 2006 and reviewed, approved and/or helped to prepare each proxy statement Black Box filed from 1997 to 2003, which falsely represented that Black Box stock options were granted at no less than the fair market value of the stock on the date of grant of the option, in order to conceal the existence of and their participation in the Individual Defendants' integrated and continuous scheme to backdate (and conceal the backdating of) Black Box stock option grants. As a result of the foregoing, the Individual Defendants personally and financially benefited from the backdated Black Box stock option grants particularized herein.

40.     Furthermore, Boetticher, F. Young, McAndrew, Baird, B. Young, Andrews, Greig and Newlin signed Black Box's financial statements for 1996 to 2006, which materially understated the Company's compensation expense and materially understated its net loss.  In addition, F. Young, Baird, Bullions, Wertheimber, Croft, McAndrew, B. Young and Andrews sold over $36 million of Black Box stock based upon their knowledge of material non-public information regarding the undisclosed practice of backdating stock options in violation of state and federal securities laws.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

41.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.   Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

42.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

43.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

> a.     exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;
>
> b.     exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules,

regulations and requirements, including acting only within the scope of its legal authority;

c.      exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits or other financial information concerning the financial condition of the Company;

d.      exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and

e.      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

44.     The Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.  According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing and reporting financial data, a corporation must establish an internal accounting control structure.  Among other things, the Individual Defendants were required to:

(1)     make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(2)     devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

(a)     transactions are executed in accordance with management's general or specific authorization; and

(b)     transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

45.     Black Box's Audit Committee Charter provides that the Audit Committee shall,

among other things,

     a.    Provide independent objective oversight of the financial reporting functions and internal controls of the Company and its subsidiaries to oversee the objectivity of its financial statements;

     b.    Conduct quality of earnings discussions with the independent accountants and appropriate members of management, including the Chief Financial Officer and Controller; and

     c.    Provide a written report to the stockholders in the Company's proxy statement in its annual meeting whether the committee has satisfied its responsibilities under the committee charter.

46.    Additionally, Black Box's Compensation Committee Charter provides that the main functions of the Compensation Committee are: (i) to evaluate and recommend to the Board the compensation philosophy and practices of the Company with respect to its executive officers; and (ii) ***to administer the Company's Stock Option Plans***.  The Compensation Committee's specific responsibilities include, *inter alia*:

     (1)    Provide to the Board of Directors, on an annual basis, its recommendation as to the total compensation of the Chief Executive Officer based upon (i) an evaluation of the objectives and performance of the Chief Executive Officer, taking into account the Company's short term and long term goals and performance, (ii) competitive market data and (iii) the Company's overall compensation philosophy. The Chief Executive Officer shall not be present during any part of the Committee's, or the Board's, deliberations concerning or vote on his or her compensation.

     (2)    Provide to the Board of Directors, on an annual basis, its recommendation as to the total compensation of the Executive Officers, other than the Chief Executive Officer, based upon (i) an evaluation of the objectives and performance of the Executive Officer, taking into account the Company's short term and long term goals and performance, (ii) competitive market data and (iii) the Company's overall compensation philosophy.

14

(3)    ***Administer the Company's 1992 Stock Option Plan, as amended, and 1992 Director Stock Option Plan, as amended*** (the "Stock Option Plans"). ***Review and approve any awards under any deferred compensation, stock option or other long-term incentive plan the Company may establish from time to time and approve any proposed amendments to any such plan*** (including the Stock Option Plans). ***The Committee shall have the sole authority to grant equity awards and to determine the timing, size and other terms of any such awards and to confer such authority on the Chief Executive Officer with respect to grants to Team Members other than the Executive Officers of the Company.***

(4)    Prepare a report for inclusion in the Company's annual proxy statement and/or Annual Report on Form 10-K summarizing the Executive Officers' compensation levels and explaining the relationship between executive compensation and the Company's performance, as required by any applicable SEC rules or regulations.    The Committee may retain or terminate any executive compensation or benefit consultants or advisors to assist it in the discharge of its responsibilities and shall have sole authority to approve the fees, expenses and other retention terms for any such consultants and advisors.

## FACTUAL ALLEGATIONS

### Backdating of Stock Option Grants to the Individual Defendants

47.    Pursuant to the terms of the Company's shareholder-approved stock option plans, including all versions of the 1992 Employee Stock Option Plan, the 1992 Company Stock Option Plan and 1992 Director Stock Option Plan (collectively, the "Plans"), all stock option grants must have an exercise price "not less than the fair market value of the stock on the date of grant of the option."

48.    Pursuant to Accounting Principles Board Opinion No. 25 ("APB 25"), "Accounting for Stock Issued to Employees," the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the date of grant exceeds the exercise price

15

of the options, the company must recognize the difference as an expense.

49.     Pursuant to Section 162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors, (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation, and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

50.     From 1996 to 2002, the Option Committee and the Compensation Committee, which, according to the Company's proxy statements filed with the SEC from 1997 to 2003, was responsible for "***administer[ing] the Company's stock option plans***" and "review[ing] and approv[ing] the compensation of the executive officers of the Company, and approv[ing] and recommend[ing] changes to the incentive plans of the Company," with the knowledge and approval of the other members of the Board, knowingly and deliberately violated the terms of the Plans, APB 25 and Section 162(m) by knowingly and deliberately backdating grants of Black Box stock options to make it appear as though the grants were made on dates when the market price of Black Box stock was lower than the market price on the actual grant dates, thereby unduly benefiting the recipients of the backdated stock options.

51.     The members of the Board who were not on the Option Committee or the Compensation Committee had actual knowledge of the backdating and knew that it violated the

terms of the Plans, APB 25 and Section 162(m).  All Board members knew that the publicly reported grant dates and statements that the Company followed APB 25 and granted stock options with exercise prices not less than the fair market value of Black Box stock on the date of grant were false because the grants were, in fact, backdated.  Furthermore, the entire Board knowingly and deliberately approved the stock option backdating scheme with knowledge of its consequences, *e.g.*, its effects on Black Box's financial statements.

52.    Beginning on August 22, 1996, the Company initiated its clear and consistent pattern of backdating stock option grants to Black Box executives and directors by purportedly granting stock options backdated to the ***lowest stock price of the month***[2], as demonstrated below:



08/22/96: BBOX stock options granted at $24.75

---

[2] With the exception of the October 9, 2002 grant, the Company calculated the exercise prices of its stock option grants using the mean of the high and low trading prices on the grant date (the "average stock price").  Accordingly, all claims and references made herein are based on the use of the average stock price.

| Purported Date of Grant | Name | Exercise Price | Number of Stock Options[3] |
|---|---|---|---|
| 08/22/96 | Boetticher | $24.75 | 65,000 |
| | F. Young | $24.75 | 65,000 |
| | Baird | $24.75 | 6,000 |
| | Bullions | $24.75 | 6,000 |
| | Wertheimber | $24.75 | at least 3,334 |
| | McAndrew | $24.75 | at least 2,580 |
| | B. Young | $24.75 | at least 5,000 |
| | Andrews | $24.75 | at least 5,000 |
| | Barker | $24.75 | at least 5,000 |
| | Fisher | $24.75 | at least 5,000 |

53.     Black Box's stock option backdating scheme rapidly became more egregious in the Company's next fiscal year.  On April 23, 1997, the Company purportedly granted Black Box stock options to at least nine of the Individual Defendants backdated to the Company's *lowest stock price of the fiscal year ended March 31, 1998*, as demonstrated below:

---

[3] Where the total number of options is unknown, *i.e.*, where the phrase at least is utilized, the stock option grant did not appear in any proxy statements filed by the Company but was first disclosed in Form 4 or 5 filings, which only included the number of options pursuant to the grant that were exercised and left unexercised on the transaction date.



| Purported Date of Grant | Name | Exercise Price | Number of Stock Options |
|---|---|---|---|
| 04/23/97 | Boetticher | $21.44 | 45,000 |
| | F. Young | $21.44 | 45,000 |
| | Baird | $21.44 | 10,000 |
| | Bullions | $21.44 | 10,000 |
| | Wertheimber | $21.44 | at least 10,000 |
| | Sampaio | $21.44 | at least 10,000 |
| | Andrews | $21.44 | at least 1,667 |
| | Newlin | $21.44 | at least 1,667 |
| | Barker | $21.44 | at least 1,667 |

54.     Additionally, following Black Box's shareholder's meeting on August 11, 1997, the Company granted stock options to several of its directors at the ***lowest stock price of the month***, as shown below:



| Purported Date of Grant | Name | Exercise Price | Number of Stock Options |
|---|---|---|---|
| 08/26/97 | Andrews | $35.19 | at least 5,333 |
| | Newlin | $35.19 | at least 5,333 |
| | Barker | $35.19 | at least 5,333 |

55.     In the same fiscal year, Defendants Boetticher, F. Young, Baird, Bullions, Wertheimer, Sampaio and Croft, some of the Company's most highly compensated executives at the time, were granted almost 600,000 Black Box stock options backdated to the Company's *lowest stock price of the fourth quarter of the fiscal year ended March 31, 1998*, as demonstrated below:



| Purported Date of Grant | Name | Exercise Price | Number of Stock Options |
|---|---|---|---|
| 01/13/98 | Boetticher | $30.25 | 158,060 |
| | F. Young | $30.25 | 175,000 |
| | Baird | $30.25 | 60,000 |
| | Bullions | $30.25 | 60,000 |
| | Wertheimber | $30.25 | at least 60,000 |
| | Sampaio | $30.25 | at least 50,000 |
| | Croft | $30.25 | at least 33,334 |

56.    The Individual Defendants continued to unduly benefit from Black Box's stock option backdating scheme during the fiscal year ended March 31, 1999.  During that fiscal year, Black Box granted at least 377,000 stock options backdated to coincide again with the Company's *lowest stock price of the fiscal year*, as demonstrated below:



| Purported Date of Grant | Name | Exercise Price | Number of Stock Options |
|---|---|---|---|
| 10/08/98 | F. Young | $21.94 | 195,000 |
| | Baird | $21.94 | 40,000 |
| | Bullions | $21.94 | 40,000 |
| | Wertheimber | $21.94 | at least 30,000 |
| | Croft | $21.94 | at least 30,000 |
| | McAndrew | $21.94 | at least 5,000 |
| | B. Young | $21.94 | at least 6,000 |
| | Newlin | $21.94 | at least 6,000 |

57.   Defendants F. Young, Baird and Bullions, the Company's most highly compensated executives, were purportedly granted Black Box stock options on April 8, 1999. The purported April 8, 1999 stock option grants were again backdated to coincide with the Company's ***lowest stock price of the fiscal year ended March 31, 2000***, as displayed below:



| Purported Date of Grant | Name | Exercise Price | Number of Stock Options |
|---|---|---|---|
| 04/08/99 | F. Young | $32.14 | 20,000 |
| | Baird | $32.14 | 10,000 |
| | Bullions | $32.14 | 10,000 |

58.     Later in that same fiscal year, the Company purportedly granted Black Box stock options to at least nine of the Individual Defendants, including several members of the Black Box Board, on August 30, 1999.  These stock options were backdated to coincide with the Company's **_lowest stock price of the second quarter of the fiscal year ended March 31, 2000_**, as shown below:



| Purported Date of Grant | Name | Exercise Price | Number of Stock Options |
|---|---|---|---|
| 08/30/99 | F. Young | $45.06 | 30,000 |
| | Baird | $45.06 | 35,000 |
| | Bullions | $45.06 | 35,000 |
| | Wertheimber | $45.06 | at least 25,000 |
| | Croft | $45.06 | at least 35,000 |
| | B. Young | $45.06 | at least 5,000 |
| | Andrews | $45.06 | at least 5,000 |
| | Greig | $45.06 | at least 5,000 |
| | Newlin | $45.06 | at least 5,000 |

59.    The Company's proxy statement filed with the SEC on July 7, 2000 alleges a grant of 145,000 Black Box stock options to F. Young, the Company's CEO, on October 29, 1999 at an exercise price of $49.31, the mean of the high and low trading prices of the Company's stock on October 21, 1999.  Notably, F. Young reported a grant date of October 21, 1999 in his Form 4 filed with the SEC on May 16, 2000.  Not surprisingly, the mean of the high and low trading prices of the Company's stock on the grant date reported in the proxy is $50.63,

a difference of $1.32 from the exercise price on the date reported in F. Young's Form 4.  More importantly, **an overall difference in value to F. Young of $191,500.**  The chart below pinpoints the grant date alleged in the Company's proxy statement and the grant date reported in F. Young's Form 4 filed with the SEC on May 16, 2000:



60.     A similar pattern involving the same stock option recipients was followed the next fiscal year.  On October 11, 2000, at least the same Defendants who received backdated Black Box stock options in the prior fiscal year, purportedly were granted Black Box stock options backdated to coincide with one of the Company's lowest stock prices of the fiscal year ended March 31, 2001, and the **lowest stock price of the third quarter of the fiscal year ended March 31, 2001**, as demonstrated below:



| Purported Date of Grant | Name | Exercise Price | Number of Stock Options |
|---|---|---|---|
| 10/11/00 | F. Young | $42.25 | 140,402 |
| | Baird | $42.25 | 26,152 |
| | Bullions | $42.25 | 26,152 |
| | Wertheimber | $42.25 | at least 21,772 |
| | Croft | $42.25 | at least 26,817 |
| | B. Young | $42.25 | at least 5,002 |
| | Andrews | $42.25 | at least 5,002 |
| | Greig | $42.25 | at least 5,000 |
| | Newlin | $42.25 | at least 5,002 |

61.    Furthermore, F. Young, Bullions, Wertheimber and Croft, four of the Company's most highly compensated executives, and several members of the Board were purportedly granted at least 370,000 stock options backdated to the Company's ***lowest stock price of the second quarter of the fiscal year ended March 31, 2002***, as follows:

26



| Purported Date of Grant | Name | Exercise Price | Number of Stock Options |
|---|---|---|---|
| 09/21/01 | F. Young | $41.45 | 195,000 |
| | Bullions | $41.45 | 50,000 |
| | Wertheimber | $41.45 | at least 25,000 |
| | Croft | $41.45 | at least 30,000 |
| | B. Young | $41.45 | at least 5,000 |
| | Andrews | $41.45 | at least 5,000 |
| | Greig | $41.45 | at least 5,000 |
| | Newlin | $41.45 | at least 5,000 |

62.     Each and every one of the aforementioned Black Box stock option grants was dated just before a significant increase in Black Box's stock price and/or at or near Black Box's lowest stock price of the pertinent fiscal year, fiscal quarter and/or month.  The reason for the extraordinary pattern set forth in the preceding paragraphs is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made.  Rather, the Option Committee and the Compensation Committee members, with the knowledge and approval of the other members of the Board, knowingly and deliberately backdated the stock

27

option grants to make it appear as though the grants were made on dates when the market price of Black Box stock was lower than the market price on the actual grant dates, thereby unduly benefiting the Individual Defendants who received backdated Black Box stock options. This improper backdating, which violated the terms of the Plans, resulted in stock option grants with lower exercise prices, which improperly increased the value of the stock options and improperly reduced the amounts the Individual Defendants had to pay to the Company upon the exercise of the stock options.

### Post-SOX Backdating at Black Box

63. Prior to the enactment of the Sarbanes-Oxley Act of 2002 ("SOX"), Defendants were able to engage in the backdating practices described above with relative ease, because under federal law they were only required to report stock option grants to the SEC once a year.

64. Pursuant to SOX, beginning on August 29, 2002, executives and directors were required to report stock option grants to the SEC within two days of the grant. With this new reporting requirement in place, the stock option backdating pattern seen previously from 1996 to 2002 came to an end.

65. All (10 out of 10) of the pre-SOX grants made during the relevant period and disclosed in proxy statements and Form 4s and 5s were dated to coincide with particularly low stock prices, which is strongly indicative of backdating. Furthermore, all (9 out of 9) of the grants made during the relevant period to the top five compensated executives, which were disclosed in the Company's proxy statements, were dated to coincide with particularly low prices, which is also strongly indicative of backdating. In addition, one of the post-SOX grants, which was not reported until the Company filed its July 1, 2003 proxy statement, was dated to coincide with a particularly low closing stock price.

28

66.     In a report released on October 20, 2006, the research firm of Glass, Lewis & Co. conducted an extensive study surrounding the belief that late Form 4 filings can be one of the signs of post-SOX stock option backdating (the "Glass Lewis Report").  Specifically, according to the Glass Lewis Report, the research firm noted that "when we find late Form 4 filings where the price of the underlying stock increased materially between the purported grant date and the day the Form 4 was filed, we believe this raises legitimate questions about whether the grant was backdated."

67.     On October 9, 2002, McAndrew, who eventually became the Company's Vice President and CFO two months later, was granted 20,000 Black Box stock options coinciding with one of the Company's lowest closing stock prices of the fiscal year, and the ***lowest closing stock price of the third quarter of the fiscal year ended March 31, 2003***, as demonstrated below:



68.     According to a statistical analysis conducted by Derivative Plaintiffs, there is a 99.96% likelihood that the fortuitous pattern of stock option grants alleged herein was not the result of random chance.  Indeed, the only explanation that is consistent with the observed

pattern is that the Black Box stock options were backdated to coincide with favorable dates when the price of Black Box stock was particularly low.

## **Individual Defendants' Dissemination of False Financial Statements**

69.    The Individual Defendants prepared, approved and/or signed Black Box's annual and quarterly SEC reports during the relevant period.  The Individual Defendants knowingly and deliberately caused Black Box to disseminate materially false and misleading statements in the periodic filings that the Individual Defendants prepared, approved and/or signed.

70.    The Individual Defendants' secret stock option backdating scheme caused each of Black Box's Forms 10-K405, Forms 10-K and Forms 10-Q for the relevant period to materially understate Black Box's compensation expense and materially overstate the Company's net income or materially understate its net loss, because the Individual Defendants failed to expense the "in the money" portion of Black Box's stock option grants during the period as required by APB 25.

71.    As a result of the improper backdating of stock options, the Company, with the knowledge, approval and participation of each of the Individual Defendants,

a.    violated the terms of the Company's shareholder-approved stock option plans by granting stock options with exercise prices less than the fair market value of the stock on the actual date of grant;

b.    violated APB by failing to recognize compensation expenses incurred when the improperly backdated stock options were granted;

c.    violated Section 162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals and violated the terms of the Company's shareholder-approved stock option plans; and

d.    produced and disseminated false financial statements to

30

> Black Box shareholders and the market that improperly
> recorded and accounted for the backdated stock option
> grants, and thereby understated compensation expenses
> and overstated net income.

72.    Black Box's financial results for the fiscal years ended in 1997 through 2006 were reported in Annual Reports on Form 10-K and/or Form 10-K405 filed with the SEC.  Each Form 10-K and/or 10-K405 was simultaneously distributed to Black Box shareholders and the investing public.  Defendants Boetticher, F. Young, McAndrew, Baird, B. Young, Andrews, Greig, Newlin and Fisher, with the knowledge that the financial statements were false and misleading, each signed at least one Form 10-K and/or Form 10-K405 filed with the SEC between 1997 and 2006:

| Defendant Signatory | Form 10-K or Form 10-K405 for the Fiscal Years Ended March 31, |
|---|---|
| Boetticher | 1997-1998 |
| F. Young | 1997-2006 |
| McAndrew | 2003-2006 |
| Baird | 1997-2002 |
| B. Young | 1997-2004 |
| Andrews | 1997-2006 |
| Greig | 2000-2006 |
| Newlin | 1997-2004 |
| Fisher | 1997 |

73.    Furthermore, in each of its Annual Reports on Form 10-K and/or 10-K405 filed with the SEC from 1997 to 2003, the Company, with the knowledge, approval and participation of each of the Individual Defendants, falsely represented that it followed APB 25 to account for stock-based compensation:

> The Company continues to apply APB Opinion No. 25 in
> accounting for stock-based compensation.  To date, no
> compensation cost has been recognized as all stock options have

31

an exercise price equal to the market price on the date of the grant. Had the Company elected to recognize compensation cost based on the fair value basis under SFAS No. 123, the Company's net income and earnings per share would have been reduced to the pro forma amounts for the years ended March 31.

### False CEO and CFO Certifications

74.     In connection with the filing of certain Annual Reports on Form 10-K during the relevant period, F. Young and McAndrew filed false Certifications of Chief Executive Officer and Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (the "Certification").

75.     In each Certification, F. Young and McAndrew made certain representations with respect to the accuracy and truthfulness of the information contained therein.  For example, the Company's Form 10-K for the fiscal year ended March 31, 2003, contained the following Certification made by F. Young and McAndrew:

I, Fred C. Young/Michael McAndrew, certify that:

    1.    I have reviewed this annual report on Form 10-K of Black Box Corporation;

    2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

    3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of and for the periods presented in this report;

    4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

c) presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or person's performing the equivalent function):

a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officer and I have indicated in this annual report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

\*                \*                \*                \*                \*                \*

In connection with the Annual Report of Black Box Corporation (the "Company") on Form 10-K for the quarter ended March 31, 2003 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), each of the undersigned officers of the Company, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, certifies that to his knowledge:

(1) The Report fully complies with the requirements of Section 13(a)

or 15(d) of the Securities and Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all
       material respects, the financial condition and results of operations
       of the Company.

76.    Additionally, despite their many statements to the contrary, as alleged herein, the
Individual Defendants did not design a system of adequate controls; nor did they ever make any
true attempt to do so.  Individual Defendants' failure to establish adequate internal controls could
not have been the exercise of valid business judgment, and it rendered all of their statements
during the relevant period regarding their controls materially false and misleading when issued.
Because defendants made no true effort in this regard, the Company's financial reporting was
inherently unreliable throughout the relevant period.

### False and Misleading Proxy Statements

77.    The Individual Defendants caused Black Box to send to shareholders proxy
statements in connection with the Company's annual shareholder meetings during the relevant
period.   The Individual Defendants drafted, approved and/or signed Black Box's proxy
statements during that period.  Between 1997 and 2003, the Individual Defendants prepared
and/or reviewed each proxy statement before the statements were filed with the SEC.
Defendants knew, or were deliberately reckless in not knowing, that the proxy statements were
materially false and misleading.

78.    The Black Box proxy statements that were sent to shareholders by the Company
and the Individual Defendants in connection with annual shareholders' meetings typically
concerned the election of directors, the approval and adoption of Black Box's stock option plan,
the authorization to reserve shares for future issuance under the stock option plans, and
ratification of the selection of Black Box's auditor.  Each proxy statement sent to shareholders

during this period contained materially false and misleading disclosures or omitted information about Black Box's stock option practices, as detailed below.

**Black Box's 1996 Proxy Statement**

79.     On or about July 8, 1996, Black Box filed a Form 14A proxy statement with the SEC.  In the proxy statement, the Board, through the Report of its Compensation Committee (Barker, Fisher and Norred) and Option Committee (B. Young and Andrews), made the following representations regarding the roles of the Compensation Committee and the Option Committee, and the Company's stock option plans:

> The Compensation Committee of the Board of Directors is charged with administering the Company's compensation programs for executive officers, including basic compensation and incentive compensation plans. The Option Committee of the Board of Directors is charged with administering the Company's stock option plans, including the Employee Plan. The Company believes that its total executive compensation package should be designed to facilitate the achievement of short- and long-range Company goals, to recognize individual executive performance and contribution, and to promote increased value creation for the Company's stockholders. To this end, the Company, the Compensation Committee and the Option Committee seek to:
>
>     - Hire, train, develop, compensate and retain the highest quality executives possible for the Company's success.
>
>     - Reward executives for outstanding contributions to the achievement of the Company's goals and overall success.
>
>     - Provide incentives for executives to align their goals with those of the stockholders through pay-for-performance and growth-driven compensation in the form of cash compensation and stock option plans.
>
>          *               *               *               *               *
>
> STOCK OPTION PLAN
>
> In fiscal 1993, the Company's Board of Directors and stockholders approved the Employee Plan, pursuant to which stock options may be granted by the Option Committee to key employees, including those who may be executive officers of the Company. This plan was amended in fiscal 1995 and fiscal 1996 pursuant to a vote of stockholders to increase the number of shares available for the grant of

35

options thereunder. Information with respect to the options granted to the Named Executive Officers in fiscal 1996 is set forth in the table entitled "Option Grants in Last Fiscal Year" appearing elsewhere in this proxy statement. The Option Committee believes that the options granted are consistent with the Company's overall compensation policies and the individual compensation packages of each Named Executive Officer.

Historically the Company has issued Non-Qualified Stock Options at the fair market value on the date of grant. The Option Committee's anticipates continuing this practice in the future.

**Black Box's 1997 Proxy Statement**

80.     On or about June 26, 1997, Black Box filed a Form 14A proxy statement with the SEC.  In the proxy statement, the Board, through the Report of its Compensation Committee (Barker, Fisher and Norred) and Option Committee (B. Young and Andrews), made representations virtually identical to those made in the Company's 1996 proxy statement regarding the roles of the Compensation Committee and the Option Committee, and the Company's stock option plans.

**Black Box's 1998 Proxy Statement**

81.     On or about July 6, 1998, Black Box filed a Form 14A proxy statement with the SEC.  In the proxy statement, the Board, through its Report of the Compensation Committee (B. Young, Andrews, Barker and Norred), made the following representations regarding the role of the Compensation Committee and the Company's stock option plans:

The Compensation Committee of the Board of Directors is charged with administering the Company's compensation programs for executive officers, including basic compensation and incentive compensation plans, and the Company's stock option plans, including the Employee Plan. The Company believes that its total executive compensation package should be designed to facilitate the achievement of short- and long-range Company goals, to recognize individual executive performance and contribution, and to promote increased value creation for the Company's stockholders. To this end, the Company and the Compensation Committee seek to:

   - Hire, train, develop, compensate and retain the highest quality executives possible for the Company's success.

   - Reward executives for outstanding contributions to the achievement of the Company's goals and overall success.

   - Provide incentives for executives to align their goals with those of the stockholders through pay-for-performance and growth-driven compensation in the form of cash compensation and stock option plans.

   \*              \*              \*              \*              \*

STOCK OPTION PLAN

In fiscal 1993, the Company's Board of Directors and stockholders approved the Employee Plan, pursuant to which stock options may be granted by the Compensation Committee to key employees, including those who may be executive officers of the Company. This plan was amended in fiscal 1995, fiscal 1996, fiscal 1997 and fiscal 1998 pursuant to a vote of stockholders to increase the number of shares available for the grant of options thereunder.  Information with respect to the options granted to the Named Executive Officers in fiscal 1998 is set forth in the table entitled "Option Grants in Last Fiscal Year' appearing elsewhere in this proxy statement. The Compensation Committee believes that the options granted are consistent with the Company's overall compensation policies and the individual compensation packages of each Named Executive Officer.

***Historically, all options granted under the Plan were exercisable at the fair market value of the stock on the date of grant of the option.*** As amended in fiscal 1998, the Plan requires that all options have an exercise price of not less than the fair market value of the stock on the date of grant of the option.

**Black Box's 1999 Proxy Statement**

82.    On or about June 28, 1999, Black Box filed a Form 14A proxy statement with the SEC.  In the proxy statement, the Board, through its Report of the Compensation Committee (B. Young and Andrews), made representations virtually identical to those made in the Company's 1998 proxy statement regarding the role of the Compensation Committee and the Company's stock option plans.

**Black Box's 2000-2002 Proxy Statements**

83.     On or about July 7, 2000, July 10, 2001, July 3, 2002 and July 1, 2003, respectively, Black Box filed Form 14A proxy statements with the SEC.   In these proxy statements, the Board, through the Reports of the Compensation Committee (B. Young, Andrews and Greig), made representations virtually identical to those made in the Company's 1998-1999 proxy statements regarding the role of the Compensation Committee and the Company's stock option plans.

84.     All of the statements concerning the purposes of Black Box's stock option plans and the value of the stock options on the date of grant, alleged herein, were knowingly false and misleading when made.   In fact, the Individual Defendants caused the Company to backdate Black Box stock option grants to themselves and certain Company insiders, which was not permitted by the Company's stock option plans.   Contrary to the representations, as alleged herein, none of the manipulated stock options to the Individual Defendants and others were ever approved by the shareholders, nor were shareholders ever aware of this illicit compensation.

## Defendants' Concealment of Their Misconduct

85.     From 1997 to 2003, the Company, with the knowledge, approval and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper stock option backdating, disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Individual Defendants and falsely stated that stock options were granted to the Individual Defendants at "not less than the fair market value of the stock on the date of grant of the option," as follows:

> a.     Black Box's proxy statement filed with the SEC on June 26, 1997 falsely reported that stock options granted to Boetticher, F. Young, Baird and Bullions were granted on August 22, 1996, and that the exercise prices of these

stock options were "not less than the fair market value of the stock on the date of grant of the option;"

b.    Black Box's proxy statement filed with the SEC on July 6, 1998 falsely reported that stock options granted to Boetticher, F. Young, Baird and Bullions were granted on April 23, 1997 and January 13, 1998, and that the exercise prices of these stock options were "not less than the fair market value of the stock on the date of grant of the option;"

c.    Black Box's proxy statement filed with the SEC on June 28, 1999 falsely reported that stock options granted to F. Young, Baird and Bullions were granted on October 8, 1998, and that the exercise price of these stock options was "not less than the fair market value of the stock on the date of grant of the option;"

d.    Black Box's proxy statement filed with the SEC on July 7, 2000 falsely reported that stock options granted to F. Young, Baird and Bullions were granted on April 8, 1999 and August 30, 1999, and that other stock options were granted to F. Young on October 29, 1999, and that the exercise prices of these stock options were "not less than the fair market value of the stock on the date of grant of the option;"

e.    Black Box's proxy statement filed with the SEC on July 10, 2001 falsely reported that stock options granted to F. Young, Baird and Bullions were granted on October 11, 2000, and that the exercise price of these stock options was "not less than the fair market value of the stock on the date of grant of the option;"

f.    Black Box's proxy statement filed with the SEC on July 3, 2002 falsely reported that stock options granted to F. Young and Bullions were granted on September 21, 2001, and that the exercise price of these stock options was "not less than the fair market value of the stock on the date of grant of the option;" and

g.    Black Box's proxy statement filed with the SEC on July 1, 2003 falsely reported that stock options granted to McAndrew were granted on October 9, 2002, and that the exercise price of these stock options was "not less than the fair market value of the stock on the date of grant of

the option."

86.     Moreover, in the Reports of the Compensation Committee of the Board in the Company's proxy statements filed between 1997 and 2003, Black Box falsely stated that its total executive compensation package was designed to "facilitate the achievement of short- and long-range Company goals, to recognize individual executive performance and contribution, and to promote increased value creation for the Company's stockholders."

87.     From 1996 to 2006, Black Box, with the knowledge, approval and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper stock option backdating, filed with the SEC Form 4s that falsely reported the dates of Black Box stock option grants to the Individual Defendants, as follows:

a.      Bullions' Form 4 filed with the SEC on May 27, 2004 falsely reported that stock options granted to Bullions had been granted on January 10, 1996;

b.      Wertheimber's Form 4 filed with the SEC on January 23, 2004 falsely reported that stock options granted to Wertheimber had been granted on April 23, 1997 and August 22, 1996;

c.      Croft's Form 4 filed with the SEC on August 4, 2005 falsely reported that stock options granted to Croft had been granted on January 13, 1998;

d.      Wertheimber's Form 4 filed with the SEC on January 23, 2004 falsely reported that stock options granted to Wertheimber had been granted on January 13, 1998;

e.      Croft's Form 4s filed with the SEC on May 12, 1999 and August 4, 2005 falsely reported that stock options granted to Croft had been granted on October 8, 1998;

f.      McAndrew's Form 4 filed with the SEC on January 23, 2004 falsely reported that stock options granted to McAndrew had been granted on October 8, 1998;

g.   Wertheimber's Form 4 filed with the SEC on January 23, 2004 falsely reported that stock options granted to Wertheimber had been granted on October 8, 1998;

h.   McAndrew's Form 4 filed with the SEC on May 26, 2004 falsely reported that stock options granted to McAndrew had been granted on October 9, 2002;

i.   F. Young's Form 4 filed with the SEC on May 15, 2001 falsely reported that stock options granted to F. Young had been granted on October 11, 2000;

j.   B. Young's Form 4 filed with the SEC on May 15, 2001 falsely reported that stock options granted to B. Young had been granted on October 11, 2000;

k.   Newlin's Form 4 filed with the SEC on May 15, 2001 falsely reported that stock options granted to Newlin had been granted on October 11, 2000;

l.   Wertheimber's Form 4 filed with the SEC on May 15, 2001 falsely reported that stock options granted to Wertheimber had been granted on October 11, 2000;

m.   Croft's Form 4 filed with the SEC on May 15, 2001 falsely reported that stock options granted to Croft had been granted on October 11, 2000;

n.   Greig's Form 4 filed with the SEC on May 15, 2001 falsely reported that stock options granted to Greig had been granted on October 11, 2000;

o.   Baird's Form 4 filed with the SEC on May 15, 2001 falsely reported that stock options granted to Baird had been granted on October 11, 2000;

p.   B. Young's Form 4 filed with the SEC on May 15, 2002 falsely reported that stock options granted to B. Young had been granted on September 21, 2001;

q.   Andrews's Form 4 filed with the SEC on August 24, 2006 falsely reported that stock options granted to Andrews had been granted on August 22, 1996;

r.   F. Young's Form 4s filed with the SEC on September 12, 1996 and August 16, 2006 falsely reported that stock

options granted to F. Young had been granted on August 22, 1996;

s.     McAndrew's Form 4 filed with the SEC on January 23, 2004 falsely reported that stock options granted to McAndrew had been granted on August 22, 1996;

t.     Boetticher's Form 4 filed with the SEC on September 12, 1996 falsely reported that stock options granted to Boetticher had been granted on August 22, 1996;

u.     Baird's Form 4 filed with the SEC on May 14, 1998 falsely reported that stock options granted to Baird had been granted on April 23, 1997;

v.     Sampaio's Form 4 filed with the SEC on May 14, 1998 falsely reported that stock options granted to Sampaio had been granted on April 23, 1997 and January 13, 1998;

w.     Barker's Form 4 filed with the SEC on May 14, 1998 falsely reported that stock options granted to Barker had been granted on April 23, 1997;

x.     Newlin's Form 4 filed with the SEC on May 14, 1998 falsely reported that stock options granted to Newlin had been granted on April 23, 1997;

y.     Andrews's Form 4 filed with the SEC on May 14, 1998 falsely reported that stock options granted to Andrews had been granted on April 23, 1997;

z.     Bullions's Form 4 filed with the SEC on May 14, 1998 falsely reported that stock options granted to Bullions had been granted on April 23, 1997 and January 13, 1998;

aa.    Wertheimber's Form 4 filed with the SEC on May 14, 1998 falsely reported that stock options granted to Wertheimber had been granted on April 23, 1997 and January 13, 1998;

bb.    Boetticher's Form 4 filed with the SEC on May 14, 1998 falsely reported that stock options granted to Boetticher had been granted on April 23, 1997 and January 13, 1998;

cc.    Barker's Form 4 filed with the SEC on May 14, 1998 falsely reported that stock options granted to Barker had been granted on August 26, 1997;

dd.     Newlin's Form 4 filed with the SEC on May 14, 1998 falsely reported that stock options granted to Newlin had been granted on August 26, 1997;

ee.     Andrews's Form 4 filed with the SEC on May 14, 1998 falsely reported that stock options granted to Andrews had been granted on August 26, 1997;

ff.     Baird's Form 4 filed with the SEC on May 14, 1998 falsely reported that stock options granted to Baird had been granted on January 13, 1998;

gg.     Baird's Form 4 filed with the SEC on May 12, 1999 falsely reported that stock options granted to Baird had been granted on October 8, 1998;

hh.     B. Young's Form 4 filed with the SEC on May 12, 1999 falsely reported that stock options granted to B. Young had been granted on October 8, 1998;

ii.     Newlin's Form 4 filed with the SEC on May 12, 1999 falsely reported that stock options granted to Newlin had been granted on October 8, 1998;

jj.     Bullions's Form 4 filed with the SEC on May 12, 1999 falsely reported that stock options granted to Bullions had been granted on October 8, 1998;

kk.     F. Young's Form 4 filed with the SEC on May 12, 1999 falsely reported that stock options granted to F. Young had been granted on October 8, 1998;

ll.     Wertheimer's Form 4 filed with the SEC on May 12, 1999 falsely reported that stock options granted to Wertheimer had been granted on October 8, 1998;

mm.     Baird's Form 4 filed with the SEC on May 16, 2000 falsely reported that stock options granted to Baird had been granted on April 8, 1999 and August 30, 1999;

nn.     Bullions's Form 4 filed with the SEC on May 16, 2000 falsely reported that stock options granted to Bullions had been granted on April 8, 1999 and August 30, 1999;

oo.     F. Young's Form 4 filed with the SEC on May 16, 2000 falsely reported that stock options granted to F. Young had been granted on April 8, 1999;

pp.     Andrews's Form 4 filed with the SEC on May 16, 2000 falsely reported that stock options granted to Andrews had been granted on August 30, 1999;

qq.     Croft's Form 4 filed with the SEC on May 16, 2000 falsely reported that stock options granted to Croft had been granted on August 30, 1999;

rr.     B. Young's Form 4 filed with the SEC on May 16, 2000 falsely reported that stock options granted to B. Young had been granted on August 30, 1999;

ss.     Newlin's Form 4 filed with the SEC on May 16, 2000 falsely reported that stock options granted to Newlin had been granted on August 30, 1999;

tt.     F. Young's Form 4 filed with the SEC on May 16, 2000 falsely reported that stock options granted to F. Young had been granted on August 30, 1999 and October 21, 1999;

uu.     Wertheimber's Form 4 filed with the SEC on May 16, 2000 falsely reported that stock options granted to Wertheimber had been granted on August 30, 1999;

vv.     F. Young's Form 4 filed with the SEC on June 21, 2001 falsely reported that stock options granted to F. Young had been granted on October 11, 2000;

ww.     Bullions's Form 4 filed with the SEC on May 15, 2001 falsely reported that stock options granted to Bullions had been granted on October 11, 2000;

xx.     Bullions's Form 4 filed with the SEC on June 13, 2002 falsely reported that stock options granted to Bullions had been granted on September 21, 2001;

yy.     Newlin's Form 4 filed with the SEC on May 15, 2002 falsely reported that stock options granted to Newlin had been granted on September 21, 2001;

zz.     Croft's Form 4 filed with the SEC on May 16, 2002 and May 22, 2002 falsely reported that stock options granted to Croft had been granted on September 21, 2001;

aaa. Bullions's Form 4 filed with the SEC on May 16, 2002 falsely reported that stock options granted to Bullions had been granted on September 21, 2001;

bbb. Wertheimber's Form 4 filed with the SEC on May 16, 2002 and May 22, 2002 falsely reported that stock options granted to Wertheimber had been granted on September 21, 2001;

ccc. Andrews's Form 4 filed with the SEC on May 15, 2002 falsely reported that stock options granted to Andrews had been granted on September 21, 2001;

ddd. Greig's Form 4 filed with the SEC on May 15, 2002 falsely reported that stock options granted to Greig had been granted on September 21, 2001;

eee. B. Young's Form 4 filed with the SEC on May 15, 2002 falsely reported that stock options granted to B. Young had been granted on September 21, 2001;

fff. Baird's Form 4 filed with the SEC on May 12, 1999 falsely reported that stock options granted to Baird had been granted on October 8, 1998;

ggg. Newlin's Form 4 filed with the SEC on May 15, 2002 falsely reported that stock options granted to Newlin had been granted on September 21, 2001;

hhh. B. Young's Form 4 filed with the SEC on January 17, 1997 falsely reported that stock options granted to B. Young had been granted on August 22, 1996;

iii. Fisher's Form 4 filed with the SEC on January 17, 1997 falsely reported that stock options granted to Fisher had been granted on August 22, 1996;

jjj. Greig's Form 4 filed with the SEC on May 16, 2000 falsely reported that stock options granted to Greig had been granted on August 30, 1999;

kkk. Wertheimber's Form 4 filed with the SEC on May 16, 2000 falsely reported that stock options granted to Wertheimber had been granted on August 30, 1999;

lll. F. Young's Form 4 filed with the SEC on June 21, 2001 and May 15, 2001 falsely reported that stock options

granted to F. Young had been granted on October 11, 2000;

mmm.   Andrews's Form 4 filed with the SEC on May 15, 2001 falsely reported that stock options granted to Andrews had been granted on October 11, 2000; and

nnn.   Bullions's Form 5 filed with the SEC on June 13, 2002 falsely reported that stock options granted to Bullions had been granted on September 21, 2001.

88.   The Individual Defendants continued to conceal their foregoing conduct from the investing public until the filing of Plaintiff John L. Anderson's complaint on November 16, 2006.

### Individual Defendants' Insider Selling

89.   During the relevant period, certain of the Individual Defendants (collectively, the "Insider Selling Defendants"), while in possession of materially adverse non-public information regarding the backdating of stock options and the false financial statements resulting therefrom, sold over $36 million of Black Box stock, a significant portion of which was obtained through the exercise of improperly backdated Black Box stock options, as follows:

| Defendant | Dates of Sales | Proceeds |
|---|---|---|
| F. Young | 11/01/02 - 08/15/06 | $15,279,018.50 |
| Baird | 08/22/00 - 07/19/02 | $3,375,500.00 |
| Bullions | 10/16/02 - 05/27/04 | $2,422,693.50 |
| Wertheimber | 06/29/99 - 01/23/04 | $5,233,975.20 |
| Croft | 02/16/00 - 08/16/06 | $7,292,612.06 |
| McAndrew | 07/31/03 - 05/26/04 | $780,127.80 |
| B. Young | 11/04/02 - 08/21/03 | $1,205,553.20 |
| Andrews | 11/14/02 - 08/22/06 | $429,990.08 |
| **TOTAL** | **06/29/99 - 08/22/06** | **$36,019,470.34** |

### BLACK BOX'S FALSE FINANCIAL REPORTING IN VIOLATION OF GAAP, SEC REGULATIONS AND IRS RULES AND REGULATIONS

90.   As a result of the Individual Defendants' improper backdating of stock options,

46

the Individual Defendants caused Black Box to violate GAAP, SEC regulations and IRS rules and regulations.

91.     Black Box's financial results for 1996 through 2006 were included in reports filed with the SEC and in other shareholder reports. In these reports, the Individual Defendants represented that Black Box's financial results were presented in a fair manner and in accordance with GAAP.

92.     The Individual Defendants' representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information "a fair presentation" of the Company's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

93.     GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time.  Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. § 210.4-01(a)(1), provides that financial statements filed with the SEC, which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate.

**Violations of GAAP**

94.     During the relevant period, the Individual Defendants caused the Company to understate its compensation expenses by not properly accounting for its stock options under GAAP and thus overstated the Company's net earnings.

95.     Under well-settled accounting principles in effect throughout the relevant period, Black Box did not need to record an expense for stock options granted to employees at the

current market price ("at the money").  The Company was, however, required to record an expense in its financial statements for any stock options granted below the current market price ("in the money").  In order to provide Black Box executives and employees with far more lucrative "in the money" options, while avoiding having to inform shareholders about millions of dollars incurred by the Company in compensation expenses (and without paying the IRS millions of dollars in employment taxes), the Individual Defendants systematically falsified Company records to create the false appearance that stock options had been granted at the market price on an earlier date.

96.     Throughout the relevant period, Black Box accounted for stock options using the intrinsic method described in APB 25.  Under APB 25, employers were required to record as an expense on their financial statements the "intrinsic value" of a fixed stock option on its "measurement date."  A stock option that is "in the money" on the measurement date has intrinsic value, and the difference between its exercise price and the quoted market price must be recorded as compensation expense to be recognized over the vesting period of the stock option. Options that are "at the money" or out of the money on the measurement date need not be expensed.   Excluding non-employee directors, APB 25 required employers to record compensation expenses on stock options granted to non-employees irrespective of whether they were "in the money" or not on the date of grant.

**Black Box's GAAP Violations Were Material**

97.     Black Box's false and misleading relevant period statements and omissions regarding its accounting were material, particularly in light of SEC guidance on materiality. SEC Staff Accounting Bulletin ("SAB") Topic 1M, Materiality, summarizes GAAP definitions of materiality.  Among other items, SAB Topic 1M says: "A matter is 'material' if there is a

substantial likelihood that a reasonable person would consider it important." It also stresses that

materiality requires qualitative, as well as quantitative, considerations. For example, if a known

misstatement would cause a significant market reaction, that reaction should be taken into

account in determining the materiality of the misstatement.

98.     SAB Topic 1M further states:

> Among the considerations that may well render material a
> quantitatively small misstatement of a financial statement item are –
>
>         \*     \*     \*
>
> whether the misstatement masks a change in earnings or other
> trends
>
> whether the misstatement hides a failure to meet analysts'
> consensus expectations for the enterprise
>
>         \*     \*     \*
>
> whether the misstatement concerns a segment or other portion of the
> registrant's business that has been identified as playing a significant role in the
> registrant's operations or profitability.

99.     SAB Topic 1M also says that an intentional misstatement of even immaterial

items may be illegal and constitute fraudulent financial reporting.

100.     Black Box's misstatements satisfy these criteria and thus were material from both

a quantitative and qualitative perspective.

### Black Box's Financial Statements Violated Fundamental Concepts of GAAP

101.     Due to these accounting improprieties, the Company presented its financial results

and statements in a manner that violated GAAP, which are described by the following

statements:

> (a)     The principle that interim financial reporting should be based upon the
> same accounting principles and practices used to prepare annual financial
> statements (APB No. 28, ¶10);

49

(b)     The principle that financial reporting should provide information that is useful to existing and potential investors and creditors and other users in making rational investment, credit and similar decisions (Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1, ¶34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶40);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)     The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

(f)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79); and

(g)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶95, 97).

102.    Further, the undisclosed adverse information concealed by the Individual Defendants during the relevant period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

### Black Box's Financial Statements Violated SEC Regulations

103.     During the relevant period, the Individual Defendants caused Black Box to violate SEC regulations by failing to disclose that the Company's senior executives had been granted backdated stock options.

104.     Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an issuer must furnish information required by Item 402 of Regulation S-K [17 C.F.R. § 229.303]. Item 402(b) and (c) require a company to provide both a Summary Compensation Table and an Option/SAR Grants table identifying the compensation of the named executive officers – the Company's CEO and its next four most highly paid executives.  Item 402 requires particularized disclosures involving a company's stock option grants in the last fiscal year.  In the summary compensation table, the issuer must identify in a column "other annual compensation" received by the named executives that is not properly categorized as salary or bonus, including any "[a]bove market or preferential earnings on restricted stock, options, SARs or deferred compensation" paid to the officer during the period.  Item 402(b)(2)(iii)(C)(2).  In the option grant table, the issuer must identify in a column "[t]he per-share exercise or base price of the options. . . . If such exercise or base price is less than the market price of the underlying security on the date of grant, a separate, adjoining column shall be added showing market price on the date of grant. . . ."  Item 402(c)(2)(iv).

105.     The Individual Defendants caused Black Box to violate SEC regulations by failing to disclose that the Company's named executive officers had been granted stock options with exercise prices below the market value on the date the Board, the Option Committee or the Compensation Committee approved the grant.

## Black Box's Violations of IRS Rules and Regulations

106.    During the relevant period, the Individual Defendants further caused Black Box to violate IRS rules and regulations due to its improper accounting for the backdated stock options. As a result, the Company's tax liabilities were understated, exposing Black Box to potential amounts owed for back taxes, penalties and interest to the IRS for improperly reporting compensation.

107.    The Individual Defendants caused the Company to violate IRS Code § 162(m), which generally limits a publicly traded company's tax deductions for compensation paid to each of its named executive officers to $1 million unless the pay is determined to be "performance-based."  In order for compensation to be performance-based, the Compensation Committee must have set pre-established and objective performance goals.  The goals must then be approved by the shareholders. Section 162(m) defines stock options as performance-based provided they are issued at an exercise price that is no less than the fair market value of the stock on the date of the grant.  Accordingly, properly issued stock options do not have to be taken into account in calculating whether an executive's compensation has exceeded the $1 million compensation cap.

108.    Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie top executives' soaring pay packages more closely to a company's performance.  This change in the tax law turned compensation practices for a company's top executives away from straight salary-based compensation to performance-based compensation, including stock options. According to former SEC Chairman Harvey Pitt: "What [162[m]] did was create incentives to find other forms of compensation so people could get over the $1 million threshold without running afoul of the code."

109.    The Individual Defendants caused Black Box to violate IRS Code § 162(m) by

providing backdated stock options to the Company's named executive officers, which were granted with exercise prices that were less than the fair market value of the stock on the date of the grant.  As a result all of the income resulting from the exercise of the stock options must be included for purposes of calculating whether the named executive's compensation exceeds the $1 million cap for federal tax purposes.

110.   The Individual Defendants further caused the Company to violate IRS rules and regulations in order to avoid having to withhold income and FICA tax from its executives and employees upon the exercise of Black Box's stock options by improperly accounting for its Nonqualified Stock Options ("NSOs") as Incentive Stock Options ("ISOs").

111.   ISOs are a form of equity compensation that may be provided to a company's employees.  ISOs are required to be granted at an exercise price that is no less than the fair market value of the stock on the date of the grant and are entitled to preferential tax treatment as they are not subject to income tax upon exercise of the stock options but only upon sale of the stock (except for the possible imposition of alternative minimum tax on the option spread at the time of exercise).  Stock options that do not qualify as ISOs are considered to be NSOs.  NSOs are not entitled to preferential treatment as they are subject to income tax and FICA withholding upon exercise.  As a result, a company that fails to withhold income tax and/or FICA upon the exercise of NSOs by its employees would be liable for the amount of the income tax and FICA that the company failed to withhold upon exercise of the stock options, in addition to interest and penalties.

112.   By improperly treating its backdated stock options as ISOs, the Individual Defendants failed to provide proper income tax and FICA withholdings upon the exercise of its stock options by its executives and employees in violation of IRS rules and regulations.

113.    The chart below illustrates Black Box's false and misleading fiscal year financial results which materially understated its compensation expenses and thus overstated its earnings:

| Fiscal Year Ended | Reported Net Income (Loss) | Reported Net Income (Loss) Per Share |
|---|---|---|
| March 31, 1997 | $24.792 million | $1.40 |
| March 31, 1998 | $32.404 million | $1.79 |
| March 31, 1999 | $38.145 million | $2.09 |
| March 31, 2000 | $48.852 million | $2.60 |
| March 31, 2001 | $64.190 million | $3.22 |
| March 31, 2002 | $62.042 million | $2.97 |
| March 31, 2003 | $48.685 million | $2.39 |
| March 31, 2004 | $47.243 million | $2.52 |
| March 31, 2005 | $29.912 million | $1.68 |
| March 31, 2006 | $37.358 million | $2.13 |

114.    Meanwhile, the Individual Defendants were causing the Company to grant them millions of backdated Black Box stock options.   The Company's executives received a significant number of backdated Black Box stock options as compensation during the relevant period.

115.    Moreover, as alleged herein, in the Reports of the Compensation Committee of the Board in the Company's proxy statements filed between 1997 and 2003, Black Box falsely stated that its total executive compensation package was designed to "facilitate the achievement of short- and long-range Company goals, to recognize individual executive performance and contribution, and to promote increased value creation for the Company's stockholders."

## INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

116.    The Individual Defendants exceeded the bounds of the law and legitimate business judgment by perpetrating their stock option backdating scheme.   The Individual

54

Defendants' misconduct was unjustifiable and constituted a gross breach of their fiduciary duties as officers and/or directors of the Company.  Specifically, the Individual Defendants breached their fiduciary duties by:

> a.   colluding with each other to backdate stock option grants;
>
> b.   colluding with each other to violate GAAP and Section 162(m);
>
> c.   colluding with each other to produce and disseminate to Black Box shareholders and the market false financial statements that improperly recorded and accounted for the backdated stock option grants and concealed the improper backdating of stock options; and
>
> d.   colluding with each other to file false proxy statements, false financial statements and false Form 4s in order to conceal the improper backdating of stock options.

117.   The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly benefit the Individual Defendants at the expense of the Company.

118.   As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained substantial damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company will be required to incur, and the loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grant.

119.   As alleged herein, certain of the Individual Defendants have exercised hundreds of thousands of Black Box backdated stock options at improperly low prices and have then sold the shares for substantial profits.  Consequently, the Individual Defendants have been unjustly enriched by garnering millions of dollars in illicit profits and depriving the Company of millions

of dollars in payments that the Company should have received upon the exercise of the stock options.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

120.    Derivative Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

121.    Derivate Plaintiffs are owners of Black Box common stock and were owners of Black Box common stock at all times relevant hereto.

122.    Derivative Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

123.    As a result of the facts set forth herein, Derivative Plaintiffs have not made any demand on the Black Box Board to institute this action against the Individual Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

124.    At the time this action commenced, the Board consisted of six directors: F. Young, Andrews and Greig, and directors Thomas W. Golonski, Richard L. Crouch and Edward A. Nicholson.   The following directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action:

> a.      F. Young, because he is directly interested in the improperly backdated stock option grants complained of herein as a recipient of the backdated stock option grants, and because his principal professional occupation is his position as Chief Executive Officer of the Company.  In his position as Chief Executive Officer, F. Young has earned[4] and stands to earn

---

[4] F. Young's total reported income from fiscal year 1996 to fiscal year 2005 is $6,405,135.00,  including:  $551,692 in 1996; $653,448 in 1997; $608,636 in 1998; $787,756 in 1999; $798,125 in 2000; $839,731 in 2001; $455,741 in 2002; $652,003 in 2003; $579,234 in 2004; and $478,769 in 2005.

hundreds of thousands of dollars more in annual salary, bonuses and other compensation, all of which must be approved by Defendant Greig who is currently a member of the Compensation Committee. Moreover, by colluding with the other backdated stock option recipients and others, as alleged herein, F. Young has demonstrated that he is unable or unwilling to act independently of these Defendants. Accordingly, F. Young is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against the Individual Defendants;

b.      Andrews and Greig, because they are directly interested in the improperly backdated stock option grants complained of herein as recipients of the backdated stock option grants. Moreover, by colluding with the other backdated stock option recipients and others, as alleged herein, Andrews and Greig have demonstrated that they are unable or unwilling to act independently of these Defendants. Accordingly, Andrews and Greig are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against the Individual Defendants;

c.      Andrews and Greig, because as members of the Option Committee and/or Compensation Committee at all relevant times hereto, Andrews and Greig knowingly and deliberately, and in complete failure to administer the Plans in a proper manner, backdated Black Box stock option grants, as alleged herein, and thus are substantially likely to be held liable for the misconduct complained of herein. Moreover, by colluding with the other backdated stock option recipients and others, as alleged herein, Andrews and Greig have demonstrated that they are unable or unwilling to act independently of the Officer Defendants; and

d.      Andrews and Greig, because as members of the Audit Committee at all times relevant hereto, Andrews and Greig knowingly and deliberately participated in and approved the filing of false financial statements and other SEC filings, as alleged herein, and knowingly and deliberately participated in and approved the Company's violations of GAAP and Section 162(m), as alleged herein, and thus are substantially likely to be held liable for the misconduct complained of herein. Moreover, by colluding with the other backdated stock option recipients and others, as alleged herein, Andrews and Greig have demonstrated that they are unable or unwilling to act

57

independently of the Officer Defendants.

125.    Defendants F. Young, Andrews and Greig's positions during the relevant period are summarized in the table below:

| Defendant | Recipient of Backdated Stock Option Grants | Member of the Option or Compensation Committee at the Time of Backdated Stock Option Grants | Member of the Audit Committee at the Time of Backdated Stock Option Grants |
|---|---|---|---|
| F. Young | x | | |
| Andrews | x | x | x |
| Greig | x | x | x |

126.    Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment.  By granting stock options with backdated exercise prices, the Individual Defendants undermined the purpose of the Plans by awarding employees compensation that had intrinsic value regardless of Black Box's stock performance.  In effect, this practice was nothing more than secret handouts to executives and employees at the expense of unsuspecting shareholders.

127.    The Individual Defendants could have complied with the shareholder-approved Plans and the law by granting those employees additional stock options under the Plans, or by granting stock options at a price less than the fair market value on the date of the grant and simply disclosing and expensing these grants.  Instead, the Individual Defendants backdated stock option grants in violation of the Company's Plans and improperly reported these grants in their financial disclosures to improve their bottom line.

128.    Additionally, despite their many statements to the contrary, as alleged herein, the Individual Defendants did not design a system of adequate controls; nor did they ever make any true attempt to do so.  The Individual Defendants' failure to establish adequate internal controls could not have been the exercise of valid business judgment, and it rendered all of their

statements during the relevant period regarding their controls materially false and misleading when issued.  Because defendants made no true effort in this regard, the Company's financial reporting was inherently unreliable throughout the relevant period.  As a result, at the very least, and to the extent that any of the Individual Defendants were not directly involved in the scheme and/or cover-up, all of the Individual Defendants (and particularly those who served on the Option Committee, Compensation Committee and/or Audit Committee) acted in an extremely reckless manner.

129.   The practice of backdating stock options is *ultra vires* and cannot be a valid exercise of business judgment because it has subjected Black Box to potentially massive liability.  Black Box will likely suffer tax liabilities for the additional compensation it will have to expense, and it has tarnished its reputation in the investment community through this deliberate and calculated conduct.

## COUNT I

### Against the Individual Defendants for
### Violations of § 10(b) and Rule 10b-5 of the Securities and Exchange Act

130.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

131.   Throughout the relevant period, the Individual Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, intentionally or recklessly employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business which operated as a fraud and deceit upon the Company.

132.   The Individual Defendants, as top executive officers and/or directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their

positions of control and authority as officers and/or directors of the Company, each of the Individual Defendants was able to and did control the conduct complained of herein.

133.    The Individual Defendants acted with scienter in that they either had actual knowledge of the fraud set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were among the senior management and/or directors of the Company and were therefore directly responsible for the fraud alleged herein.

134.    The Company relied upon the Individual Defendants' fraud in granting the Individual Defendants options to purchase shares of the Company's common stock, as alleged herein.

135.    As a direct and proximate result of the Individual Defendants' fraud, the Company has sustained millions of dollars in damages, as alleged herein.

## COUNT II

### Against the Individual Defendants for
### Violations of § 14(a) of the Securities Exchange Act

136.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

137.    Rule 14-A-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14-A-9.

138.    The proxy statements described herein violated § 14(a) and Rule 14-A-9 because they omitted material facts, including the fact that the Individual Defendants were causing Black

Box to engage in a stock option backdating scheme, a fact which the Individual Defendants were aware of and participated in from at least 1996 to 2002.

139.    In the exercise of reasonable care, the Individual Defendants should have known that the proxy statements were materially false and misleading.

140.    The misrepresentations and omissions in the proxy statements were material.  The proxy statements were an essential link in the accomplishment of the continuation of the Individual Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of the shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

141.    The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

## COUNT III

### Against Boetticher, F. Young, Baird, McAndrew and the Director Defendants for Violations of § 20(a) of the Securities Exchange Act

142.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

143.    Boetticher, F. Young, Baird, McAndrew and the Director Defendants, by virtue of their positions with Black Box and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Black Box within the meaning of § 20(a) of the Exchange Act. They had the power and influence and exercised the same to cause Black Box to engage in the illegal conduct and practices complained of herein.

## COUNT IV

### Against the Individual Defendants
### for Accounting

144.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

145.    As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

146.    As alleged in detail herein, the Individual Defendants breached their fiduciary duties by, among other things, engaging in a scheme to grant backdated stock options to themselves and/or certain other officers and directors of the Company and cover up their misconduct.

147.    The Individual Defendants possess complete and unfettered control over their improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants.

148.    As a result of the Individual Defendants' misconduct, Black Box has been damaged financially and is entitled to a recovery as a result thereof.

149.    Plaintiffs demand an accounting be made of all stock option grants made to any of the Individual Defendants, including, but not limited to, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the dates the stock options were exercised, as well as the disposition of any proceeds received by any of the Individual Defendants via sale or other exercise of the grants.

## COUNT V

### Against the Individual Defendants for
### Breach of Fiduciary Duty and/or Aiding and Abetting

150.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

151.     As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

152.     As alleged in detail herein, the Individual Defendants breached their fiduciary duties by, among other things, engaging in a scheme to grant backdated stock options to themselves and/or certain other officers and directors of the Company and cover up their misconduct.

153.     In breach of their fiduciary duties of loyalty and good faith, the Individual Defendants agreed to and did participate with and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets to themselves and/or other Company insiders.

154.     The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to and did, unduly benefit the Individual Defendants at the expense of the Company.

155.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, as alleged herein.

## COUNT VI

### Against the Individual Defendants
### for Unjust Enrichment

156.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

157.    The Individual Defendants were unjustly enriched by their receipt and retention of backdated stock option grants and the proceeds they received through exercising backdated Black Box stock options, as alleged herein and it would be unconscionable to allow them to retain the benefits thereof.

158.    To remedy the Individual Defendants' unjust enrichment, the Court should order them to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such stock options that have been exercised, sold, pledged or otherwise monetized.

## COUNT VII

### Against the Individual Defendants
### for Rescission

159.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

160.    As a result of the acts alleged herein, the stock option contracts between the Individual Defendants and the Company entered into during the relevant period were obtained through the Individual Defendants' fraud, deceit and abuse of control.  Further, the backdated Black Box stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the Company's shareholder-approved stock option plans.

161.    All contracts which provide for stock option grants to the Individual Defendants and were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executor contracts cancelled and declared void.

## COUNT VIII

### Against the Individual Defendants
### for Corporate Waste

162.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

163.    By failing to properly consider the interests of the Company and its shareholders, by failing to conduct proper supervision and by giving away millions of dollars to Defendants via the stock option backdating scheme, the Individual Defendants have caused Black Box to waste valuable corporate assets.

164.    As a result of the Individual Defendants' corporate waste, they are liable to the Company.

## COUNT IX

### Against the Individual Defendants
### for Breach of Contract

165.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

166.    As a result of the backdating of stock options granted to them, the Individual Defendants have breached their employment agreements with Black Box and violated the stock option plan, all of which provide that the exercise price of all of the stock options would not be less than the fair market value of the stock on the date of grant of the option.

167.    Black Box and its shareholders have been damaged by the Individual Defendants' breach of contract.

### COUNT X

### Against the Insider Selling Defendants for Violation of the Pennsylvania Securities Act of 1972

168.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

169.    At the time that the Insider Selling Defendants sold their shares of the Company's common stock as set forth herein, by reason of their high executive and/or directorial positions with the Company, the Insider Selling Defendants had access to highly material information regarding the Company, including the information set forth herein regarding the true adverse facts of the Company's stock option backdating, improper accounting and false financial statements.

170.    At the time of such sales, that information was not generally available to the public or the securities markets.  Had such information been generally available, it would have significantly reduced the market price of the Company's shares at that time.

171.    The Insider Selling Defendants, and each of them, had actual knowledge of material, adverse non-public information regarding the Company, and thus sold their shares of the Company's common stock in Pennsylvania in violation of the Pennsylvania Securities Act of 1972, 70 P.S. § 1-406.

WHEREFORE, Plaintiffs demand judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' misconduct;

B.      Ordering the Individual Defendants to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged or otherwise monetized, and imposing a constructive trust thereover;

C.      Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties;

D.      Directing Black Box to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action, as may be necessary, before shareholders for a vote;

E.      Awarding the Company damages as provided by the Pennsylvania Securities Act of 1972, 70 P.S. § 1-406;

F.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

Dated: January 29, 2007                    Respectfully submitted,


LAW OFFICE OF ALFRED G. YATES JR., PC

By:      s/ Alfred G. Yates, Jr.
         Alfred G. Yates, Jr. (PA17419)
         Gerald L. Rutledge (PA62027)
         429 Forbes Avenue
         519 Allegheny Building
         Pittsburgh, PA  15219
         Telephone:  (412) 391-5164
         Email: Yateslaw@aol.com

         *Plaintiffs' Liaison Counsel*

67

SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP
Eric L. Zagar
Michael Hynes
Bradley A. Dirks
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706

THE WEISER LAW FIRM, P.C.
Robert Weiser
Brett D. Stecker
121 N. Wayne Avenue, Suite 100
Wayne, PA 19107
Telephone: (610) 225-2677

*Plaintiffs' Co-Lead Counsel*

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re BLACK BOX CORPORATION | ) | |
| DERIVATIVE LITIGATION | ) | No. 2:06-CV-01531 TMH |
| | ) | |
| This Document Relates to: All Actions | ) | |
| | ) | |
| | ) | *Electronically Filed* |

<u>**CERTIFICATE OF SERVICE**</u>

I, Alfred G. Yates, Jr., Esquire, hereby certify that on January 29, 2007, I caused the following document: *Consolidated Verified Shareholder Derivative Complaint*, together with any attachment(s) thereto, to be filed electronically with the Clerk of Court through ECF, and that a notice of electronic filing was sent to the following:

Thomas R. Johnson, Esquire
Kirkpatrick and Lockhart Preston Ellis Gates LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222-2312
(412) 355-6488
Firm: (412) 355-6501
Email: klgateseservice@klgates.com

*Defense Counsel for Black Box Corporation*

**LAW OFFICE OF ALFRED G. YATES JR., PC**

By:      /s/ Alfred G. Yates, Jr.
         Alfred G. Yates, Jr. (PA17419)